GENERAL ELECTRIC COMPANY,
Plaintiff,

v.

DEUTZ AG, Defendant.

No. CIV.A. 98–370 ERIE.

United States District Court,
W.D. Pennsylvania.

July 31, 2000.

Roger H. Taft, MacDonald, Illig, Jones & Britton, Erie, PA, for plaintiff.

Kenneth W. Wargo, John Paul Garhart, Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc., Erie, PA, Evan Williams, Gardner, Carton & Douglas, Chicago, IL, for defendant.

### MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Plaintiff General Electric Company filed the instant action against Defendant Deutz AG on December 22, 1998. It alleges that Deutz breached section 9.08 of the Commercial Agreement entered into by General Electric, Montoren Werke Mannheim ("MWM") and Deutz by failing to provide MWM with sufficient funds to enable it to perform its obligations under the agreement. During the pendency of this action, on July 8, 1999, Deutz submitted a claim for arbitration against General Electric with the ICC International Court of Arbitration. It requested that the arbitration

court decide, by way of a negative declaratory judgment, that General Electric has no claim against Deutz for breach of section 9.08. Presently pending before the Court is Plaintiff's Motion for a Permanent Injunction. Plaintiff requests that the Court enjoin Deutz from participating in the ICC arbitration proceeding. For the reasons that follow, the motion is granted.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. *The Parties*

Plaintiff General Electric is a company incorporated under the laws of the State of New York (Trial Ex. B at 1). It is in the business of designing and manufacturing locomotives, diesel engines, and certain other products (*See id.*). Defendant Deutz is a corporation incorporated under the laws of the Federal Republic of Germany. It is principally engaged in the manufacture of engines and industrial plan equipment. MWM, which is not a party to this action, is a corporation incorporated under the laws of the Federal Republic of Germany; it is engaged in the design and manufacture of diesel engines and engine products (*See id.*).

### B. *Commercial Agreement*

On June 15, 1993, General Electric, MWM and Deutz entered into a "Commercial Agreement" for the mutual cooperative development of an innovative line of diesel engines (*See id.*). Essentially, MWM agreed to design engines for General Electric and General Electric would then build the engines at its facilities in Pennsylvania (*See id.*). Under the agreement, MWM was responsible for "all costs and expenses relating to the design, development and testing of the 632 Engine Family and the performance of MWM's other obligations" and General Electric was responsible "for all its costs and expenses relating to the manufacture and testing of the Additional Prototypes." (*Id.* § 1.07). General Electric was also obligat-

ed to "contribute DM 23.1 million of the costs of design, development, and testing of the 632 Engine Family." (*Id.*)

Deutz, formerly named Klockner–Humboldt–Deutz ("KHD"), also had obligations under the agreement. The signature page of the agreement provided, "KHD hereby joins in this Agreement and agrees to become a party to this Agreement for purposes of the obligations set forth in Sections 9.08 hereof and Sections 4.05, 4.06, and 4.07 hereof." (*Id.* at 45). Section 9.08 stated that KHD would provide MWM "with sufficient funds, by way of capital contribution, loan, or otherwise, to enable MWM or any such Affiliates to perform all of their respective obligations, commitments, undertakings, and covenants under this Agreement." (*Id.* § 9.08). Sections 4.05, 4.06 and 4.07 detailed the parties duties to keep certain information confidential (*Id.* §§ 4.05, 4.06, 4.07).

Additionally, article seven of the agreement contained an arbitration provision which provided that "[a]ll disputes, controversies, and claims directly or indirectly arising out of or in relation to this Agreement", if they cannot be resolved by negotiations between the parties, must be submitted to international arbitration (*Id.* at 36). The arbitrators would then rule on the dispute in accordance with the terms of the agreement and if their decision could not be made by referencing the agreement, they would resolve the dispute by applying Swiss law (*Id.* at 37).

### C. *Proceedings in This Court*

On December 22, 1998, Plaintiff General Electric filed the instant action against Deutz. The complaint alleged that Deutz had breached section 9.08 of the agreement "[b]y failing to provide MWM with sufficient funds to enable MWM to perform its obligations under the Contract." (Am.Compl.¶ 44). It alleged that as a result of the breach, General Electric suffered damages in excess of eighty million dollars including "[d]elayed deliveries and

lost sales" and "[d]evotion of substantial internal resources to undertake engineering and other tasks with respect to the 632 Engine Family that should have been performed by MWM." (*Id.* ¶¶ 39, 46).

Deutz filed a motion to compel international arbitration on April 13, 1999. On December 29, 1999, we denied the motion. We held that the contract was ambiguous as to whether Deutz and General Electric agreed to arbitrate their disputes and that such ambiguity should be resolved by a jury after presentation of extrinsic evidence. On February 10 and 11, 2000, we held a jury trial for that purpose; the jury found that Deutz and General Electric did not agree to arbitrate their disputes. As a result of the verdict, we reaffirmed our denial of Deutz's motion to compel arbitration on February 28, 2000. Deutz subsequently filed a Motion for New Trial, which we denied on July 28, 2000.

### D. *Proceedings with the ICC Court of Arbitration*

On July 8, 1999, while Defendant's motion to compel international arbitration was pending with this Court, Deutz submitted a claim for arbitration against General Electric with the International Chamber of Commerce Court of Arbitration ("ICC Court"). Deutz requested that the ICC Court decide, by way of a negative declaratory judgment, that General Electric has no claim against Deutz for breach of Section 9.08.[1]

By way of background, under the ICC Rules of Arbitration, the ICC Court of Arbitration is an administrative body attached to the ICC. *See* Rules of Arbitration of the International Chamber of Commerce (hereinafter "ICC Rules") Article 1(1). The ICC Court does not itself settle arbitration disputes; rather, it sets the arbitrations in motion by referring them to arbitral tribunals and it ensures that the arbitrations are conducted in accordance with ICC Rules. *See id.* Article 1(1), App. I Article 1(1).[2]

A party "wishing to have recourse to arbitration" may commence the proceedings by submitting a Request for Arbitration to the Secretariat of the ICC Court of Arbitration. *See id.* Article 4(1). The Request must include, among other things, a statement of the relief sought and the party's nomination of an arbitrator. *See id.* Article 4(3). Once it is received, the Secretariat will send a copy of the Request to the other party (the Respondent). *See id.* Article 4(5). The Respondent must then file an Answer with the Secretariat within 30 days; the Answer shall include a response and the Respondent's nomination of an arbitrator. *See id.* Article 5(1).

Once the ICC Court has confirmed the arbitrators, *see id.* Article 9, the Secretariat will submit the file to the Arbitral Tribunal and the Tribunal will immediately draw up "a document defining its Terms of Reference." *Id.* Article 18(1). The document shall include a summary of the parties claims, the relief sought and a list of issues to be determined. *See id.* The terms of reference must be signed by the parties and approved by the ICC Court. *See id.* Article 18(2). The Tribunal will then proceed to establish the facts of the case and hear the arguments of the parties. *See id.* Article 20. "When it is satisfied that the parties have had a reasonable opportunity to present their cases,

---

1. Specifically, Deutz requested the following: "The Arbitration Court is asked to state by way of a negative declaratory judgment that General Electric has no claim against Deutz AG pursuant to Section 9.08 of the Commercial Agreement dated June 15, 1993." (Doc. No. 14 Ex. C at 1).

2. Section 1 of Article 1 of Appendix I of the ICC Rules of Arbitration provides: "The function of the International Court of Arbitration of the International Chamber of Commerce (the "Court") is to ensure the application of the Rules of Arbitration and the Rules of Conciliation of the International Chamber of Commerce, and it has all the necessary powers for that purpose." ICC Rules App. I Article 1(1).

the Arbitral Tribunal shall declare the proceedings closed." *Id.* Article 22. It will then issue an Award which must be confirmed by the ICC Court. *See id.* Articles 25, 27.

A party may challenge the jurisdiction of the Arbitral Tribunal on the grounds that they did not agree to arbitrate at two separate stages of the process. First, before the file is transmitted to the Arbitral Tribunal, the party may raise the issue with the ICC Court. The ICC Court's review of jurisdiction is limited, however; it merely considers whether "it is prima facie satisfied that an arbitration agreement under the Rules may exist." *Id.* Article 6(2).[3] "If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed." *Id.* If it is so satisfied, then "any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." *Id.* As long as "there is prima facie evidence of an arbitration agreement, the question of the ultimate validity or existence of such an agreement and other jurisdictional questions will be left to the arbitrators." Eric A. Schwartz, *The Resolution of International Commercial Disputes Under the Auspices of the ICC International Court of Arbitration,* 18 Hastings Int'l & Comp. L.Rev. 719, 728 (1995). Any decision rendered by an arbitral tribunal as to its jurisdiction is subject to review by a court of competent jurisdiction situated in the country where the arbitral tribunal is located.

In this case, after Deutz submitted its Request to the Secretariat on July 8, 1999, General Electric wrote a letter to the ICC Court on July 21, 1999 wherein it objected to any assertion of jurisdiction by the ICC Court (Doc. No. 62 Ex. A). It stated,

Before the ICC accepts jurisdiction over the dispute between GE and Deutz, we want the ICC to understand that GE objects to any such assertion of jurisdiction because the contract between GE and Deutz does not, on its face, contain an arbitration clause. Therefore, pursuant to Article 6(2) of the ICC Rules of Arbitration, the ICC Court should determine that the arbitration cannot proceed and should so notify the parties. At the very least, the ICC Court should stay its determination of whether a prima facie arbitration clause exists between GE and Deutz until after the United States District Court has ruled on the question of its jurisdiction, including the existence of an arbitration agreement, which that Court presently has sub judice.

(*Id.*). General Electric also wrote a letter dated July 30, 1999 to inform the ICC Court that it would not be submitting an answer since it did not believe the ICC had jurisdiction (*See id.*).

On October 7, 1999, pursuant to Article 6(2), the ICC Court ruled that there was prima facie evidence of the existence of an arbitration agreement between the parties (*See id.* Ex. D). Thereafter, the Arbitral Tribunal was nominated and confirmed and began its proceedings. General Electric asked the Arbitral Tribunal to determine that the jury verdict is res judicata and precludes its jurisdiction. Alternatively, it asked the Tribunal to independently decide that it did not have jurisdiction because the parties did not agree to arbi-

---

**3.** According to several commentators, the question of whether there is prima facie evidence of the existence of an arbitration agreement is purely administrative in nature; the ICC Court simply does a cursory review of the documents submitted by the parties to verify that an arbitration agreement might reasonably be said to exist between them. *See* Eric A. Schwartz, *The Resolution of International Commercial Disputes Under the Auspices of the ICC International Court of Arbitration,* 18 Hastings Int'l & Comp. L.Rev. 719, 728 (1995) ("In practice, the Court will verify whether an arbitration agreement might reasonably be said to exist between the parties."); Alan Redfern and Martin Hunter, *Law and Practice of International Commercial Arbitration* § 5–34 at 265 (3d ed. 1999) ("The Secretariat simply checks whether a clause providing for ICC arbitration appears in the documents submitted by the claimant. If it does, the ICC's Court will then establish an arbitral tribunal and refer the case to it.").

trate. It is our understanding that these issues have been fully argued, including extensive hearings held on May 23 and 24, 2000, and are currently under consideration by the Arbitral Tribunal.

### E. Proceedings Before the High Court of Justice in England

On April 6, 2000, Deutz filed an application in the High Court of Justice in England for what was essentially an anti-anti-suit injunction (Doc. No. 72 (Rivkin Aff.) Ex. A). It requested that the High Court temporarily restrain General Electric from asking this Court to enjoin Deutz from pursuing its arbitration claim until after the Arbitral Tribunal has ruled on the issue of res judicata and jurisdiction (See id.).[4] The same day, the High Court issued the temporary restraining order ex parte, enjoining General Electric from pursuing its motion for injunction in this Court until it (the English court) could hold a hearing on the issue of equitable relief (See id. Ex. B).

The High Court held the hearing on Deutz's application for a restraining order on April 12 and 13, 2000 (Doc. No. 69 Ex. E). Deutz contended that High Court should exercise its jurisdiction to grant the injunction on the grounds that General Electric is in clear breach of an agreement to arbitrate (See id.).

The next day, on April 14, 2000, the High Court lifted the previous ex parte order and denied Deutz any further equitable relief (Doc. No. 72 at 30). In a thorough written opinion, Justice Thomas explained that in light of Deutz's contentions, the threshold issue was whether Deutz made out a sufficient case that there was an arbitration agreement (See id. at 12, 15). He noted that his standard of review in that regard was "whether there was a serious issue to be tried." (Id. at 15) Justice Thomas concluded, "I have

come to the view on this extraordinary short issue of construction that there is no serious issue to be tried and that Deutz cannot establish a sufficient case that there is an arbitration agreement." (Id.) He based his conclusion on the fact that the signature block did not mention the arbitration provision and the fact that the arbitration provision mentioned General Electric and MWM but not KHD (Id.).

Alternatively, Justice Thomas concluded that even if there was a serious issue to be tried, the Court should not exercise its discretion and issue the injunction (See id. at 16–30). He relied on several factors to reach this conclusion, including the fact that Deutz failed to act promptly in filing the arbitration and that many of the arguments that were being made to the High Court could be made to this Court for our consideration in ruling on the instant motion (See id.).

## II. DISCUSSION

General Electric requests that this Court permanently enjoin Deutz from participating in the ICC arbitration in London. The parties make several arguments with regard to the propriety of an such an injunction. We will address each of these arguments in turn.

### A. The Level of Discretion this Court May Employ

Citing PaineWebber, Inc. v. Hartmann, 921 F.2d 507 (3d Cir.1990), General Electric argues that since the jury determined that the parties did not agree to arbitrate, we have no discretion with respect to this motion and are "obliged" to enjoin the ICC arbitration. In Hartmann, the Hartmanns maintained several brokerage accounts with PaineWebber under an agreement which required them to submit certain disputes to arbitration. See id. at 509. Pursuant to the arbitra-

---

**4.** According to the High Court, the application also included a claim for "wider" relief, including the issuance of an injunction restraining General Electric from taking action in this Court in the event that the arbitrators decided that they had jurisdiction (Doc. No. 72 Ex. C at 11).

tion provision, the Hartmanns filed a demand for arbitration with the New York Stock Exchange Department of Arbitration alleging that PaineWebber fraudulently mishandled their accounts. *See id.* In response, PaineWebber filed a motion for preliminary injunction in the United States District Court for the Western District of Pennsylvania to prevent the arbitration of the dispute. *See id.* The district court determined that the Hartmann's claim was not arbitrable and granted the motion. *See id.* at 514.

On appeal, the Third Circuit set out the general principles with regard to arbitrability. *See id.* at 510–11. It began with the well settled principle that "[a]s a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so." *Id.* at 511 (citing *AT & T Tech. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). The court stated:

> If a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement, it is obliged to enjoin arbitration. If, on the other hand, the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute.

*Id.* (emphasis added). Following these principles, the Third Circuit agreed with the district court that the claim was not arbitrable and affirmed the district court's grant of a preliminary injunction. *See id.* at 515.

Deutz argues that the proposition set forth in *Hartmann*—that a district court is obliged to enjoin arbitration if it concludes the parties did not agree to arbitrate—is limited to domestic arbitrations and inapplicable to international arbitrations. We agree. The arbitration enjoined in *Hartmann* was a domestic arbitration because it was governed by rules promulgated un-

der U.S. law and it took place in the United States. In contrast, the ICC arbitration in London is an international arbitration. It is governed by international arbitration rules, it will be adjudicated by a panel of arbitrators from different countries, and their decision will be subject to review by an English court.

 The distinction between a domestic and an international arbitration is important because of the principle of international comity, which provides that "a domestic court normally will give effect to executive, legislative, and judicial acts of a foreign nation." *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187, 191 (3d Cir.1994) (quoting *Remington Rand v. Business Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir.1987)). Comity "dictates deference and mutual respect for concurrent foreign jurisdiction", *Kirby v. Norfolk S. Ry. Co.*, 71 F.Supp.2d 1363, 1370 (N.D.Ga.1999), and it "should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971).

In this case, the principle of comity requires us to pay respect to the international nature of the Arbitral Tribunal and the ICC Rules. Therefore, we decline to summarily grant the injunction as General Electric argues that *Hartmann* requires and will instead apply the doctrine applicable to antisuit injunctions, which necessarily incorporates an analysis of comity.

## B. Antisuit Injunctions and International Comity

 It is well settled, and the parties do not dispute, that a district court possesses the authority to enjoin parties subject to their jurisdiction from pursuing parallel litigation before foreign tribunals. The general rule, however, is that "parallel proceedings on the same in personam claim should ordinarily be allowed to proceed

simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." *Laker Airways, Ltd. v. Sabena Belgian World Airlines*, 731 F.2d 909, 926 (D.C.Cir.1984).

■ The Courts of Appeals follow two different approaches for determining when a court may exercise its discretion and enjoin a foreign tribunal in the absence of a judgment which can be pled as res judicata. The Fifth, Seventh and Ninth Circuits follow what has been referred to as the "liberal approach". These circuits place less importance on international comity and hold that a court may enjoin a foreign proceeding if that parallel proceeding is vexatious and duplicative.[5] *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 626 (5th Cir.1996); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431–32 (7th Cir.1993); *Seattle Totems Hockey Club, Inc. v. National Hockey League*, 652 F.2d 852, 856 (9th Cir.1981); *In re Unterweser Reederei, Gmbh*, 428 F.2d 888, 896 (5th Cir.1970), *rev'd on other grounds*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). They reason that "allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away", *Unterweser*, 428 F.2d at 896, would result in unnecessary delay and substantial inconvenience to the parties. *See Kaepa*, 76 F.3d at 627 (quoting *Unterweser*, 428 F.2d at 896); *Seattle Totems*, 652 F.2d at 856. Further, they point out that "separate adjudications could result in inconsistent rulings or even a race to judgment." *Seattle Totems*, 652 F.2d at 856.

The Courts of Appeals for the District of Columbia and the Second and Sixth Circuits follow what has been referred to as the "restrictive approach." These circuits "place[ ] a premium on preserving international comity," *Kirby v. Norfolk S. Ry. Co.*, 71 F.Supp.2d 1363, 1367 (N.D.Ga.1999), and hold that the fact that the parallel litigation is duplicative and vexatious is not enough to warrant an antisuit injunction. *See Gau Shan Co., Ltd. v. Bankers Trust Co.*, 956 F.2d 1349, 1354 (6th Cir.1992); *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir.1987); *Laker Airways*, 731 F.2d at 937. Under the restrictive approach, a court should only issue a foreign anti-suit injunction when the foreign proceeding (1) threatens its own jurisdiction over the matter at issue or (2) threatens strong public policies of the United States. *See Gau Shan Co.*, 956 F.2d at 1354; *China Trade*, 837 F.2d at 36; *Laker Airways*, 731 F.2d at 937.[6]

The restrictive approach was first adopted by the Court of Appeals for the District of Columbia in *Laker Airways Limited v. Sabena*, 731 F.2d 909 (D.C.Cir. 1984). In that case, the court rejected the liberal approach; it held that since duplication and vexatiousness are likely to be present in all concurrent parallel actions, that approach "is prima facie inconsistent with the rule permitting parallel proceedings in concurrent in personam actions." *Id.* at 928. It also explained that the policies underlying the liberal approach—preventing unnecessary delay and substantial inconvenience to the parties and avoiding a race to judgment—"do not outweigh

5. In *In re Unterweser Reederei, Gmbh*, 428 F.2d 888 (5th Cir.1970), *rev'd on other grounds*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the Fifth Circuit held that a court may enjoin parties from litigating in a foreign court if the foreign litigation would: "(1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) where the proceedings prejudice other equitable considerations." *Id.* at 890.

6. The standard for issuance of an antisuit injunction against a foreign tribunal has also arisen in the Eighth and Eleventh Circuits; however, the positions of these courts remain unclear. *See Mutual Service Casualty Ins. Co. v. Frit Indus., Inc.*, 805 F.Supp. 919 (M.D.Ala. 1992), *aff'd*, 3 F.3d 442 (11th Cir.1993) (Eleventh Circuit summarily affirmed the district court's application of the restrictive approach); *Medtronic, Inc. v. Catalyst Research Corp.*, 518 F.Supp. 946 (D.Minn.), *aff'd*, 664 F.2d 660 (8th Cir.1981) (Eighth Circuit affirmed district court's application of liberal approach without discussion).

the important principles of comity that compel deference and mutual respect." *Id.* The court also explained that the issuance of an injunction to protect the court's jurisdiction or to protect the public policies of the forum is not inconsistent with the principles of comity. *See id.* at 929–31. It indicated that a court which does so to protect its own jurisdiction is acting defensively rather than in an offensive manner to disrespect the proceedings in a foreign court. *See id.* Further, it noted that protection of the forum's public policies by issuing an injunction

> is similar to the rule that a foreign judgment not entitled to full faith and credit under the Constitution will not be enforced within the United States when contrary to the crucial public policies of the forum in which enforcement is requested. Both rules recognize that a state is not required to give effect to foreign judicial proceedings grounded on policies which do violence to its own fundamental interests.

*Id.* at 931.

The Third Circuit has not expressly adopted either approach. However, in *Compagnie des Bauxites de Guinea v. Insurance Company of North America,* 651 F.2d 877 (3d Cir.1981), *aff'd on other grounds,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), a case that pre-dates *Laker Airways,* the court explicitly rejected the liberal approach and implied that more deference must be paid to the principle of international comity. *See id.* at 887. In *Bauxites,* Compagnie Des Bauxites de Guinea ("CBG"), a company that mines and sells bauxite in the Republic of Guinea, filed suit in the United States District Court for the Western District of Pennsylvania seeking to recover from excess in-

surers. *See id.* at 880. Approximately four years later, while the action in this district was still proceeding, the excess insurers sued in England to rescind the insurance contract; they alleged that "CBG failed to disclose material facts relating to the contract." *Id.* at 880. CBG then moved to enjoin the excess insurers from participating in the English action on the ground that the issues in it were identical to those in the Western District. *See id.* The district court granted the motion and enjoined the action. *See id.* at 880.

On appeal, the Third Circuit reversed the district court's order and held that a district court may not issue an antisuit injunction merely because the foreign suit is duplicative and vexatious. *See id.* at 887. The court stated,

> We do not determine that the district court lacks the power to enjoin parties from pursuing an action in another jurisdiction in every case. It is sufficient here to hold that the district court abused its discretion when it enjoined an action seeking a declaratory judgment in the courts of another sovereign. In the present case, duplication of issues and the insurers' delay in filing the London action were the sole bases for the district court's injunction, and we hold that these factors alone did not justify the breach of comity amount the courts of separate sovereigns.

*Id.*[7]

We conclude that the restrictive approach is entirely consistent with *Bauxites.* It requires more than merely duplicative and vexatious litigation and places a premium on concerns of international economy, as does *Bauxites.* Thus, our inquiry will be two-fold. First, we will consider whether the jury's verdict in this

---

7. As part of its analysis in *Bauxites,* the Third Circuit set out the general rule regarding concurrent parallel actions. It stated, " '[W]here the judgment sought is strictly in personam, both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other.' " *Compagnie des Bauxites de Guinea v. Insurance Company of North America,* 651 F.2d 877, 887 (3d Cir. 1981), *aff'd on other grounds,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed. 285 (1982) (quoting *Princess Lida v. Thompson,* 305 U.S. 456, 466, 59 S.Ct. 275, 83 L.Ed. 285 (1939)).

case, where they found that the parties did not agree to arbitrate, is a judgment which can be pled as res judicata. If it is, then we will enjoin Deutz from participating in the international arbitration. If it is not, then we will consider whether the ICC arbitration (1) threatens our jurisdiction or (2) threatens strong public policies of the United States.

### 1. *Res Judicata*

As we stated above, although parallel proceedings in a foreign tribunal should ordinarily be allowed to proceed simultaneously, a court may enjoin those proceedings if it has reached a judgment which can be pled as res judicata. *See Bauxites,* 651 F.2d at 887. In *Laker Airways,* the court reasoned, "When the injunction is requested after a previous judgment on the merits, there is little interference with the rule favoring parallel proceedings in matters subject to concurrent jurisdiction. Thus, a court may freely protect the integrity of its judgment by preventing their evasion through vexatious or oppressive relitigation." *Laker Airways,* 731 F.2d at 928.

General Electric argues that this Court's order dated February 28, 2000 denying Deutz's motion to compel arbitration based on the jury's verdict that no agreement to arbitrate exists is a final judgment on the merits for purposes of applying the doctrine of res judicata. Deutz disagrees. It argues that while the February 28, 2000 order may satisfy the relaxed requirements for a final judgment under collateral estoppel, it does not satisfy the strict requirements for a final judgment under res judicata.

■ Res Judicata, also referred to as claim preclusion, "gives dispositive effect to a prior judgment if 'a particular issue, although not litigated, could have been raised in the earlier proceeding.'" *Churchill v. Star Enter.,* 183 F.3d 184, 194 (3d Cir.1999); *see also Board of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. v. Centra,* 983 F.2d 495,

504 (3d Cir.1992). It requires: "(1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privies; and (3) a subsequent suit based on the same cause of action." *Churchill,* 183 F.3d at 194; *see Centra,* 983 F.2d at 504; *Equal Employment Opportunity v. United States Steel Corp.,* 921 F.2d 489, 492 (3d Cir.1990).

■ Collateral estoppel, also referred to as issue preclusion, "prevents parties from litigating again the same issues when a court of competent jurisdiction has already adjudicated the issue on its merits." *Witkowski v. Welch,* 173 F.3d 192, 198 (3d Cir.1999). It requires the following: "(1) the issue decided in the prior adjudication must be identical with the one presented in the later action; (2) there must have been a final judgment on the merits; (3) the party against whom collateral estoppel is asserted must have been a party or in privity with the party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in question in the prior adjudication." *Schroeder v. Acceleration Life Ins. Co. of Pennsylvania,* 972 F.2d 41, 45 (3d Cir.1992).

■ The Third Circuit has repeatedly stated that the requirements for a "final judgment" are less stringent in the context of collateral estoppel than they are for res judicata. *See Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 358 (3d Cir.1999); *First Jersey Nat'l Bank v. Brown,* 951 F.2d 564, 569 (3d Cir.1991). "[T]he effectiveness of issue preclusion does not require the entry of a judgment, final in the sense of being appealable." *Brown,* 951 F.2d at 569. Rather, for purposes of issue preclusion, a final judgment "includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Greenleaf,* 174 F.3d at 358 (quoting Restatement of

Judgments § 13); *Brown,* 951 F.2d at 569 (same).[8]

The Third Circuit addressed the issue of whether an order determining the question of arbitrability was a final judgment for purposes of res judicata in *Towers, Perrin, Forster & Crosby, Inc. v. Brown,* 732 F.2d 345 (3d Cir.1984). In that case, the defendants, Brown and Riding, were employed as insurance agents in the California office of the plaintiff, Towers, Perrin, Forster & Crosby, Inc. ("Towers Perrin"). *See id.* at 346. As part of their employment, they were eligible to purchase shares of the company, which the company would repurchase when they left the firm's employ. *See id.* The terms and conditions of share ownership were specified in a Shareholder's Agreement which contained a noncompete provision; it provided that a stockholder leaving the employment of Towers Perrin would forfeit the increase over the purchase price of his shares unless he agreed not to compete with Towers Perrin for two years after leaving the firm. *See id.* It also provided that "any dispute 'with respect to the provisions' governing share ownership would be subject to arbitration." *Id.* Both Brown and Riding decided to leave Towers Perrin and start a competing business. *See id.* Towers Perrin gave them notice of the non-compete provision, informing them "that it would not redeem their stock at its appreciated value unless they agreed to, and did, abide by the noncompetition covenant." *Id.*

Instead of agreeing to the non-compete provision, Brown and Riding filed an action in California Superior Court seeking "a declaratory judgment that the noncompetition and forfeiture provisions were un-

enforceable, and damages in the amount of the appreciation" of their stock. *Id.* at 347. In response, Towers Perrin filed a motion to compel arbitration, which the superior court denied. Towers Perrin appealed and the California Court of Appeals affirmed "on the ground that the Agreement involved employee compensation, and that California Labor Code § 229 prohibits arbitrating such disputes." *Id.* Towers Perrin then filed a petition in the District Court for the Eastern District of Pennsylvania to compel arbitration pursuant to the Federal Arbitration Act and to stay the California proceedings. *See id.* The district court granted the motion and stayed the California proceedings on the merits. *See id.*

Brown and Riding appealed to the Court of Appeals for the Third Circuit. *See id.* They argued that the district court erred in holding that the dispute was arbitrable because the California court's decision that it was not arbitrable was res judicata. *See id.* Towers Perrin contended, however, that the state court decision was not res judicata because its order was not final for res judicata purposes. *See id.* at 347–48. The Third Circuit agreed with Brown and Riding and held that the California state court order denying order was a final order and that res judicata applied. *See id.* at 348–50. The court stated that it was simply common sense to conclude that the decision that a dispute is or not arbitrable is conclusive of that issue. *See id.* at 348. It stated:

There must be a limitation on successive petitions to compel arbitration other than the imagination or willpower of the

8. For issue preclusion, "[f]inality 'may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'" *First Jersey Nat'l Bank v. Brown,* 951 F.2d 564, 569 (3d Cir.1991) (quoting *Dyndul v. Dyndul,* 620 F.2d 409, 412 n. 8 (3d Cir.1990)). The Third Circuit has indicated that the following factors should be considered when determining whether a judgment is "sufficiently firm" to be accorded preclusive effect: "(1) whether the prior decision was 'adequately deliberated and firm' and not 'avowedly tentative'; (2) whether the parties were fully hears; (3) whether the court supported its decision with a reasoned opinion; [and] (4) whether the court's prior decision was subject to appeal or was in fact reviewed on appeal." *Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 358 (3d Cir.1999); *see also Brown,* 951 F.2d at 569.

party seeking arbitration, lest judicial proceedings on the merits be indefinitely delayed. Ordinarily this limitation is supplied by the bar of res judicata, and TPFC has called to our attention no authorities suggesting otherwise.

*Id.* The court also concluded that the order was res judicata despite the fact that the merits of the underlying dispute had not yet been decided. *See id.* It characterized the state court proceeding as two separate proceedings—one to compel arbitration and one for a declaratory judgment and damages—and noted that the proceeding regarding arbitrability was finally determined on the merits. *See id.* Finally, the court noted that its holding was consistent with the Restatement of Judgments which provides that a matter can be res judicata as to part of a case while litigation continues as to other matters. *See id.*

We hold that based on *Towers Perrin,* our February 28, 2000 order denying Deutz's motion to compel arbitration based on the jury's verdict that no agreement to arbitrate exists is a final judgment on the merits for purposes of applying the doctrine of res judicata. Like the proceedings in the state court in *Towers Perrin* regarding arbitrability, the proceedings in this Court on Deutz's Motion to Stay and Compel Arbitration essentially constituted a separate action on the merits of the arbitrability of the dispute. Further, our order is clearly final and conclusive in the sense that the issue will not be relitigated in this Court during the proceedings on the merits of the General Electric's breach of contract claim. As the Third Circuit stated in *Towers Perrin,* there must be some limitation on Deutz's ability to seek a second opinion from another tribunal; that limitation is res judicata. *See id.* at 349.[9]

### 2. *Restrictive Approach*

Even if our order did not represent a judgment which could be pled as res judi-

cata, it would still be appropriate to grant General Electric's petition for an injunction under the restrictive approach.

■ As we stated above, under the restrictive approach, the fact that foreign parallel litigation is duplicative and vexatious is not enough to warrant an antisuit injunction. *See Gau Shan,* 956 F.2d at 1354; *China Trade,* 837 F.2d at 36; *Laker Airways,* 731 F.2d at 937. Rather, a court should only issue a foreign anti-suit injunction when the foreign proceeding (1) threatens its own jurisdiction over the matter at issue or (2) threatens strong public policies of the United States. *See Gau Shan Co.,* 956 F.2d at 1354; *China Trade,* 837 F.2d at 36; *Laker Airways,* 731 F.2d at 937.

### a. *Threat to Our Jurisdiction*

■ General Electric argues that Deutz's attempt to protect its interests by filing the ICC arbitration demonstrates that continuance of the arbitration proceeding is a threat to our jurisdiction. It also maintains that the proceeding that Deutz initiated with the High Court of England is evidence of Deutz's intent to strip this Court of jurisdiction to adjudicate the merits of this dispute.

According to the Court of Appeals of the District of Columbia in *Laker Airways,* "Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full and fair justice to litigants." *Laker Airways,* 731 F.2d at 927. "[W]hen the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing and injunction against the litigant's participation in the foreign proceedings." *Id.*

---

9. We also conclude that under the circumstances of this case, Deutz's distinction between issue preclusion and claim preclusion is a distinction without a difference. Even if application of the doctrine of issue preclusion

were more appropriate, its effect under these circumstances would be the same as res judicata—to preclude litigation of the merits before the Arbitral Tribunal.

Two scenarios have arisen under which courts have held that their jurisdiction was threatened sufficiently to warrant an anti-suit injunction. First, courts have held that where their basis for jurisdiction is in rem or quasi in rem, concurrent proceedings pose a threat to their jurisdiction. *See Gau Shan Co.*, 956 F.2d at 1355–56; *China Trade*, 837 F.2d at 36. "Where jurisdiction is based on the presence of property within the court's jurisdictional boundaries, a concurrent proceeding in a foreign jurisdiction poses the danger that the foreign court will order the transfer of the property out of the jurisdictional boundaries of the first court, thus depriving it of jurisdiction over the matter." *Gau Shan Co.*, 956 F.2d at 1355–56. Second, in in personam proceedings, "where the foreign proceeding is not following a parallel track but attempts to carve out exclusive jurisdiction over concurrent actions, an injunction may be necessary to avoid the possibility of losing validly invoked jurisdiction." *Laker Airways*, 731 F.2d at 927; *see also Gau Shan Co.*, 956 F.2d at 1356; *China Trade*, 837 F.2d at 36. Notably, a court's jurisdiction is "not threatened by the possibility that a ruling of a foreign court might eventually result in the voluntary dismissal of the claim before the United States court." *Gau Shan Co.*, 956 F.2d at 1356; *see Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1212–13 (D.C.Cir.1989).

Since this action is not an in rem proceeding, we will focus on whether Deutz is asking the International Arbitral Tribunal to "carve out exclusive jurisdiction" over this matter. *Laker Airways*, 731 F.2d at 927. The seminal case in this area is *Laker Airways*. In that case, Laker Airways, a British airline, filed an antitrust action in the District Court for the District of Columbia against several domestic and foreign defendants. *See id.* at 915. Three months later, one of the defendants filed suit in the High Court of Justice of the United Kingdom seeking a declaratory judgment that no laws were violated and an injunction forbidding Laker Airways

from pursuing its antitrust action in the District of Columbia. *See id.* The High Court of Justice granted the injunction. *See id.* Laker Airways subsequently sought a preliminary injunction in the United States district court to prevent the remaining defendants from filing any action in a foreign court that would interfere with the district court's jurisdiction. *See id.* The district court granted the injunction and the defendants appealed to the Court of Appeals for the District of Columbia. *See id.* Applying the restrictive approach, the court of appeals affirmed the grant of the injunction on the ground that the English cause of action threatened its jurisdiction. *See id.* at 927–28. The court noted that "the sole purpose of the English proceeding [was] to terminate the American action." *Id.* at 928. It stated, "due to the lack of any prior notice by the four foreign defendants, the district court was threatened with a potential fait accompli by the appellants which would have virtually eliminated the court's effective jurisdiction over Laker's facially valid claim." *Id.*

As in *Laker Airways*, our jurisdiction is threatened by the continuance of the ICC arbitration in England. Under the Federal Arbitration Act and the ICC Rules, a court of law and an arbitral tribunal may not have concurrent jurisdiction over a cause of action; only one of the forums may have jurisdiction. *See PaineWebber v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990) ("If a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside the substantive scope of the agreement, it is obliged to enjoin arbitration. If, on the other hand, the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute."); ICC Rules Article 6 (indicating that the arbitration cannot proceed if the parties did not agree to arbitrate). If the parties agreed to arbitrate

and the claim is within the scope of the arbitration provision, then the arbitrators have jurisdiction to the exclusion of the court. If the parties did not agree to arbitrate or the claim is not within the scope of the arbitration provision, then the court has jurisdiction to the exclusion of the arbitrators.

In issuing our February 28, 2000 order denying Deutz's Motion to Compel Arbitration based on the jury verdict, we effectively asserted that this Court has jurisdiction over the dispute, jurisdiction that is exclusive as to any arbitration panel. Consequently, continuation of the ICC arbitration threatens our jurisdiction. By filing the "Request for Arbitration" and attempting to proceed before the Tribunal, Deutz has essentially requested that the Arbitral Tribunal "carve out exclusive jurisdiction" over the action. *Laker Airways,* 731 F.2d at 929. Indeed, if the Tribunal were to decide that the parties did agree to arbitrate, it would in effect be declaring that it had jurisdiction and this Court does not.

### b. *Public Policy of the Forum*

General Electric also argues that the issuance of an injunction is necessary to protect the public policy of this forum. Specifically, it argues that an injunction is necessary to protect the sanctity of the jury verdict and the jury system.

"An antisuit injunction may be appropriate when a party seeks to evade the forum's important policies by litigating before a foreign court." *Gau Shan Co.,* 956 F.2d at 1357. Although there is no clear-cut rule regarding what satisfies this requirement, "the availability of slight advantages in the substantive or procedural law to be applied in the foreign court" is not sufficient. *Laker Airways,* 731 F.2d 932 n. 73. "An impermissible evasion is much more likely to be found when the party attempts to elude compliance with a statute of specific applicability upon which the party seeking an injunction may have relied, and which is designed to effectuate important [public] policies." *Id.*

Our research has located very few cases which have applied the evasion of public policy factor to a request for an antisuit injunction. *Laker Airways* was an antitrust suit brought by a British Airline corporation against other foreign and domestic airline corporations. *See id.* at 915. The court in that case granted an injunction forbidding the defendants from filing a parallel action in a foreign court. *See id.* In addition to its conclusion that such an action would interfere with its jurisdiction, the court held that the injunction was necessary to prevent the defendants from attempting to escape application of United States anti-trust laws, which are designed to effectuate important domestic public policies. *See id.* at 932.

*Farrell Lines Incorporated v. Columbus Cello–Poly Corporation,* 32 F.Supp.2d 118 (S.D.N.Y.1997), arose out of a maritime accident wherein the Cargo on the vessel tipped over and hit the ground, causing damages estimated at $800,000. *See id.* at 123. The owner of the vessel sued its exporter's insurers seeking declaratory judgments with respect to (1) the forum selection clause in the bill of lading and (2) the extent of the liability. *See id.* at 122. While the action was pending in the United States District Court for the Southern District of New York, the insurers filed suit in Italy seeking recovery of damage to the Cargo. *See id.* In response, the plaintiff in the United States action filed for an injunction prohibiting the insurers from proceeding with the Italy action. *See id.* The court granted the injunction on the ground that otherwise, two important public policies of the forum would be frustrated. *See id.* at 130. According to the court, those policies were (1) the United States policy favoring enforcement of forum selection clauses and (2) the policy promoting liability limitation provisions. *See id.* at 130–31. With regard to the second policy, the court indicated that the Carriage of Goods by Sea Act's "protections reflect the important policy goal of limiting a carrier's liability when it is not

apprised of the true value of goods, so that the carrier does not, in effect, function as the insurer of the goods." *Id.* at 130.

We conclude that preservation of the sanctity of a jury verdict is an important public policy of the United States. It is fundamental to our democracy and to our system of justice. As the Supreme Court stated in *Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935), "Maintenance of the jury trial as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Id.* at 486, 55 S.Ct. 296. Indeed, "[j]ury verdicts are not to be lightly overturned as courts recognize that a 'traditional sanctity' attaches to the solemn verdict of a jury." *Ware v. Unified Sch. District No. 492,* 881 F.2d 906 (10th Cir.1989). Therefore, Deutz's continued participation in the ICC arbitration in London threatens the sanctity of the jury verdict rendered in February 2000. This provides an independent basis under the previously described test for issuance of an injunction.

In sum, an injunction forbidding Deutz's continued participation in the ICC arbitration in London is appropriate because our February 28, 2000 order constitutes a final judgment on the merits which can be pled as res judicata. Further, even if it did not, General Electric is entitled to the injunction because it has satisfied the requirements of the restrictive approach to antisuit injunctions. Deutz's continued participation in the ICC arbitration threatens our jurisdiction and is a threat to an important public policy of the United States. Clearly, these two factors outweigh the deference we must pay to the principle of international comity.

## C. *Elements of Permanent Injunction*

■ Deutz also argues that General Electric has not met its burden to show that it is entitled to a permanent injunc-

tion. To be entitled to permanent injunctive relief, General Electric must show (1) actual success on the merits, (2) that it will suffer irreparable harm if relief is not granted, (3) that Deutz will not suffer irreparable harm if relief is granted, and (4) that granting the relief will be in the public interest. *See Gruntal & Co., Inc. v. Steinberg,* 854 F.Supp. 324, 332 (D.N.J. 1994) (citing *Amoco Prods. Co. v. Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) and *National Resources Defense Council, Inc. v. Texaco, Inc.,* 906 F.2d 934, 941 (3d Cir.1990)).

### 1. *Actual Success on the Merits*

■ The Third Circuit addressed the standard for "success on the merits" in the context of a motion to enjoin an arbitration proceeding in *PaineWebber, Inc. v. Hartmann,* 921 F.2d 507 (3d Cir.1990). The court held that in order to achieve "success on the merits" for purposes of a motion to enjoin an arbitration proceeding, the plaintiff must show that the claims are not arbitrable. *See id.* at 514. General Electric has clearly met the standard here by virtue of the jury verdict.

### 2. *Irreparable Harm to General Electric*

General Electric argues that it will suffer irreparable harm if it is forced to submit to arbitration a dispute which it did not agree to arbitrate. We agree. The Supreme Court has repeatedly stated that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) and *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 570–71, 80 S.Ct. 1363, 4 L.Ed.2d 1432 (1960) (Brennan, J., concurring)). Based on this principle, the Third Circuit held in *Hartmann* that compelling a party to arbitrate absent such an agree-

ment is per se irreparable harm. *See Hartmann,* 921 F.2d at 515; *see also Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations,* 107 F.3d 979, 985 (2d Cir.1997); *McLaughlin Gormley King Co. v. Terminix Int'l Co., L.P.,* 105 F.3d 1192, 1194 (8th Cir.1997); *H. Brad Kerr v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* Civ. A. No. 87–3223, 1987 WL 14515, at *2 (E.D.Pa. July 24, 1987).

Deutz points out that General Electric has had an opportunity to argue to the Arbitral Tribunal (1) that the international arbitration should be terminated due to the res judicata effect of the jury determination and (2) that there is no arbitration agreement. Deutz argues that General Electric cannot show irreparable harm at this point because if the Arbitral Tribunal agrees with General Electric and finds that it does not have jurisdiction, that decision would, subject to judicial review in an English court, terminate the arbitration.

A similar issue was addressed by the Third Circuit in *Hartmann.* In that case, the Hartmanns argued that PaineWebber could have presented the same arguments to the arbitrator regarding arbitrability. *Hartmann,* 921 F.2d at 514. They maintained that if the arbitrator accepted those arguments, as the district court did, he would have dismissed the case and there would be no irreparable harm. *See id.* The Third Circuit disagreed. It noted that the question of arbitrability "is undeniably an issue for judicial determination", *id.* (quoting *AT & T Tech.,* 475 U.S. at 649, 106 S.Ct. 1415) and held:

> we think it obvious that the harm to a party would be per se irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority. Even if such things could be known in advance, it would be irrelevant whether the arbitra-

tor's determination would be the same as the court's.

*Id.* at 515, 106 S.Ct. 1415.

*Hartmann* is not directly on point because, as we have stated previously, it is a domestic arbitration wherein the arbitrator has no authority to determine its own jurisdiction. *See AT & T Tech.,* 475 U.S. at 649, 106 S.Ct. 1415 ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). By contrast, in an international arbitration, the Arbitral Tribunal does have the authority to determine its own jurisdiction under its own rules. *See* ICC Rules Article 6. Despite this distinction, however, we conclude that requiring General Electric to continue to litigate the issue of arbitrability in the international arbitration would cause irreparable harm. This is so even though the Tribunal has not yet issued its decision on whether the claims are arbitrable. Based on oral argument, it seems clear that an adverse ruling against Deutz would precipitate an appeal and the continuation of the litigation.

### 3. *Irreparable Harm to Deutz*

Deutz argues that "[t]he grant of a permanent injunction will irreparably harm Deutz AG because such injunction would forever bar Deutz from pleading its case to the ICC Arbitral Tribunal, the independent, transnational forum that Deutz believes the parties agreed would resolve such disputes." (Defs. Br. at 30). It maintains that if it is enjoined, it "will have been prevented from proceeding with international arbitration notwithstanding the possibility that the Court's denial of Deutz AG's motion to stay is ultimately reversed on appeal." (*Id.*)

We conclude that Deutz will not be irreparably harmed if it is enjoined from pursuing the ICC arbitration because, as the jury determined, General Electric and Deutz did not agree to arbitrate their disputes. Moreover, Deutz will have a full

and fair opportunity in the proceedings in this Court to defend against the allegations raised in General Electric's complaint.

### 4. *Public Interest*

Finally, we conclude that issuance of the injunction is in the public interest. It helps to ensure that parties such as General Electric who have not agreed to arbitrate are not subjected to arbitration. It also preserves the integrity of the jury system and the sanctity of the jury verdict.

### D. *Nature of the Injunction*

 Lastly, we must determine the nature of the injunction that we will issue. "In granting injunctive relief, the court's remedy should be no broader than necessary to provide full relief to the aggrieved plaintiff." *McLendon v. Continental Can Co.,* 908 F.2d 1171, 1182 (3d Cir.1990); *see Ameron, Inc. v. U.S. Army Corps of Eng'rs,* 787 F.2d 875, 888 (3d Cir.1986). It must "be tailored to remedy the specific harms shown rather than to enjoin 'all possible breaches of the law.'" *Louis W. Epstein Family Partnership v. Kmart Corp.,* 13 F.3d 762, 771 (3d Cir.1994).

General Electric requests that we permanently enjoin Deutz "from continuing to pursue its Request for Arbitration dated July 8, 1999, submitted to the International Chamber of Commerce International Court of Arbitration at ICC Arbitration Case No. 10574/iBWD." It also requests that we order Deutz to deliver a letter to the ICC Court of Arbitration and the Arbitral Tribunal within two days of our decision withdrawing its Request for Arbitration and requesting the cessation of all arbitration proceedings. It suggests that Deutz should be required to do this "notwithstanding any decision which may be issued by the Arbitration Tribunal ... and that defendant Deutz AG shall take no action to enforce or appeal any such decision by the Arbitral Tribunal regardless of its date of issuance."

At oral argument, Deutz argued that General Electric's proposed injunction is too broad. We agree and therefore decline to order Deutz to withdraw its Request for Arbitration or request a cessation of the proceedings. As we indicated previously, the parties have represented to the Court that argument on the issues of res judicata and arbitrability is complete and that they are merely awaiting a decision by the Tribunal. General Electric admitted at oral argument that it requested that we order Deutz to withdraw from the arbitration in order to prevent the Arbitral Tribunal from ruling on the issues of res judicata and arbitrability. It maintained that it would be harmed if the Arbitral Tribunal ruled against it on these issues, even if Deutz was not permitted to proceed on the merits. We fail to see the harm that General Electric will suffer under these circumstances.

We grant the remainder of General Electric's proposed injunction, however, and hereby permanently enjoin Deutz from appealing the forthcoming jurisdictional order of the Arbitral Tribunal to the English courts or from taking any other action in furtherance of its prosecution of the ICC arbitration.

### IV. CONCLUSION

An appropriate order follows.

### *ORDER*

AND NOW, this 31ST day of July 2000, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED THAT the Plaintiff's Motion for a Permanent Injunction [Doc. No. 53] is GRANTED. Defendant Deutz AG is hereby permanently enjoined from taking any further action in furtherance of its Request for Arbitration dated July 8, 1999, submitted to the International Chamber of Commerce Court of Arbitration at ICC Arbitration Case No. 10574/iBWD, including the filing of an appeal of the forthcoming jurisdictional order

of the Arbitral Tribunal to the English courts.