GAU SHAN COMPANY, LTD.,
Plaintiff–Appellee,

v.

BANKERS TRUST COMPANY,
Defendant–Appellant.

No. 90–5875.

United States Court of Appeals,
Sixth Circuit.

Decided Feb. 24, 1992.

1350

Ronald Lee Gilman (argued and briefed), Rebecca P. Tuttle (briefed), Farris, Hancock, Gilman, Branan & Hellen, Memphis, Tenn., for plaintiff-appellee.

Andrew J. Peck, Lawrence E. Jacobs, Jay Greenfield, Jess A. Velona, Richard A. Rosen (argued and briefed), Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Richard M. Carter, Lee L. Piovarcy

(briefed), Martin, Tate, Morrow & Marston, Memphis, Tenn., for defendant-appellant.

Before JONES, RYAN and BOGGS, Circuit Judges.

RYAN, Circuit Judge.

This is an appeal from a preliminary injunction enjoining defendant Bankers Trust Company, an American corporation, from filing a lawsuit in Hong Kong against plaintiff Gau Shan Company, a Hong Kong corporation. The issue for decision is whether the district court offended principles of international comity in issuing its preliminary injunction.

We conclude that the lower court misinterpreted the relevant principles of international comity and, as a result, abused its discretion in restraining Bankers Trust from prosecuting the foreign action. Therefore, we reverse.

I.

Gau Shan Company is a cotton merchant engaged in marketing cotton to the People's Republic of China. One of Gau Shan's sources for American cotton was the Julien Company, a Tennessee corporation. Bankers Trust was the primary source of Julien's financing for its cotton sales. Gau Shan became aware of Bankers Trust through its dealings with Julien.

In October 1989, representatives of the People's Republic of China expressed an interest in purchasing American cotton. Lawrence Lane, the managing director of Gau Shan, sought assurances from Andrew Halle, a vice president of Bankers Trust, that Bankers Trust would provide funds necessary for Julien to release, at Gau Shan's request, the cotton Gau Shan wished to sell to China. Halle assured Lane that he "would work something out." Based upon these assurances, Gau Shan agreed to sell 5,000 metric tons of cotton to China on October 20, 1989, and another 10,000 metric tons on October 23, 1989.

Thereafter, Halle learned that Julien had an overdue debt to a creditor, LOR, Inc., which had to be paid by October 26. This debt was unrelated to the Gau Shan con-

tracts, and Julien did not have the money to pay it. Halle suggested that Julien pay the LOR, Inc. obligation with the funds to be prepaid to Julien by Bankers Trust for Gau Shan's China cotton sale.

On October 25, 1989, Halle, from a Julien office in Memphis, Tennessee, called Lane in Hong Kong and told him that Bankers Trust could not advance the necessary money to Julien unless Gau Shan signed a $20 million promissory note payable to the bank. Under protest, Lane agreed and signed the note on October 27, 1989, in Hong Kong, and returned it to Bankers Trust in New York. The note contained a clause providing that any dispute concerning its terms would be governed by New York law.

After the Halle–Lane conversation, Halle instructed Donna Elzie, Julien's chief administrative officer, that Gau Shan was going to prepay for the cotton in a way that was similar to an $11 million transaction which transpired in July 1989 and that when the $20 million was credited to the Julien account she was to wire the money to Julien's creditor, LOR, Inc., to pay off that debt. After receiving the payment, LOR would release some certificated cotton which would go to Mocatta Fixtures Corporation. Mocatta would then pay Julien for the shipment, thus producing some money in the Julien account. Halle would then use the "Mocatta money" to buy the Gau Shan cotton. When Elzie asked Halle if he had told Gau Shan's Lane about using the $20 million to pay off the LOR debt, Halle replied that he had not.

On October 26, 1989, Bankers Trust deposited $20 million in Julien's account. Bankers Trust then wired the entire $20 million out of Julien's account into a bank in Atlanta, in satisfaction of the debt to LOR, Inc. Because of some problems with the release of the certificated cotton, Julien shipped to China only about 24% of the cotton it had agreed to ship on Gau Shan's behalf. As a result, Gau Shan fulfilled only a part of its obligations to China.

On February 15, 1990, and again on February 21, 1990, Bankers Trust's attorneys

wrote to Gau Shan demanding payment of the note. Bankers Trust advised Gau Shan that if the note was not paid by February 26, it would file a suit in Hong Kong against Gau Shan for its collection. Without responding to Bankers Trust, Gau Shan filed its own complaint in the United States District Court for the Western District of Tennessee on February 23, 1990, asking for rescission of the note, alleging that it was induced to sign it by Halle's fraud. Gau Shan also sought damages for common law fraud and deceit and for negligence, and claimed treble damages under Tenn.Code Ann. § 47–50–109, alleging that Bankers Trust induced Julien to breach its contract with Gau Shan.

On February 23, 1990, the district court issued a temporary restraining order enjoining Bankers Trust from initiating any legal action against Gau Shan in Hong Kong relating to the note. The restraining order was later extended by consent to accommodate Bankers Trust's request for a hearing on the legal issue of international comity. On April 4, 1990, the district court determined that its restraining order did not violate principles of international comity. A hearing was held on May 9–11, 1990 on Gau Shan's demand for preliminary injunction, following which the court determined that Gau Shan would be irreparably harmed if Bankers Trust sued Gau Shan in Hong Kong or if Bankers Trust exercised its rights under Hong Kong law to appoint a receiver for Gau Shan pursuant to Hong Kong judicial procedure or under a deed of charge governed by Hong Kong law.

The court also determined that Gau Shan had demonstrated a strong likelihood that it could succeed on the merits of its underlying fraud claims because Halle, the court found, had testified untruthfully at the injunction hearing in order to protect himself and Bankers Trust concerning the Gau Shan transaction. The trial court stated that "Halle testified falsely ... concerning ... the telephone conversations with Lane on October 19 and 25, 1989. He also testified falsely concerning his conversations with Donna Elzie on October 25, 1989." Therefore, the trial court granted Gau Shan's motion for preliminary injunction

preventing Bankers Trust from initiating a suit in Hong Kong for collection of the $20 million note.

## II.

■ This court's standard of review of a trial court's order granting a preliminary injunction is whether the lower court's decision was an abuse of discretion. *N.A.A.C.P. v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir.1989). "A district court abuses its discretion when it relies on clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Id.* at 166–67 (citation omitted). "[I]n the absence of such an error the district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases." *Id.* at 166 (citation omitted).

The underlying issue is whether, in issuing its preliminary injunction, the district court "improperly applie[d] the law or use[d] an erroneous legal standard" by misinterpreting applicable principles of international comity.

### A.

#### *International Comity*

■ It is well settled that American courts have the "power to control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926 (D.C.Cir.1984) (footnote omitted). However, "parallel proceedings on the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one [jurisdiction] which can be pled as res judicata in the other." *Id.* at 926–27 (footnote omitted). For this reason, injunctions "restraining litigants from proceeding in courts of independent countries are rarely issued." *Id.* at 927 (footnote omitted).

The circuits are split concerning the proper standards to be applied, in the context of considerations of international comi-

ty, in determining whether a foreign anti-suit injunction should be issued. The Ninth and Fifth Circuits hold that a duplication of the parties and issues, alone, is generally sufficient to justify the issuance of such an injunction. *See, e.g., Seattle Totems Hockey Club, Inc. v. National Hockey League,* 652 F.2d 852, 856 (9th Cir.1981), *cert. denied,* 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982); *In re Unterweser Reederei, GmbH,* 428 F.2d 888, 896 (5th Cir.1970), *rev'd on other grounds,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). These courts rely primarily upon considerations of vexatiousness or oppressiveness in a race to judgment in the foreign forum as sufficient grounds for an injunction. But, the Second and D.C. Circuits have held that the standard for granting a foreign antisuit injunction is whether the injunction is necessary to protect the forum court's jurisdiction or to prevent evasion of the forum court's important public policies. *See, e.g., Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1214 (D.C.Cir.1989); *China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir.1987); *Laker Airways,* 731 F.2d at 927, 937. This circuit has not addressed the question.

### 1.

### *Fifth and Ninth Circuits' View*

In *Seattle Totems,* the Ninth Circuit affirmed the issuance of an antisuit injunction against the defendants in an antitrust suit brought against the National Hockey League (NHL) which had sought to file a suit involving the same breach of contract claim in Canadian courts. 652 F.2d at 856. The NHL, plaintiffs in the Canadian action, admitted that under Fed.R.Civ.P. 13(a) their contract claim would constitute a compulsory counterclaim in the antitrust lawsuit pending in the United States court. *Id.* at 853. However, Canadian law did not require that the defendant raise its compulsory counterclaim. *Id.* at 854. The Ninth Circuit found that the district court properly invoked Rule 13(a) to govern the pending litigation rather than Canadian law and held that the injunction against the Canadian suit was proper. *Id.* at 853–54.

The court in *Seattle Totems* stated that "foreign litigation may be enjoined when it would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing courts [sic] in rem or quasi in rem jurisdiction, or (4) where the proceedings prejudice other equitable considerations." *Id.* at 855. The court held that the lower court did not abuse its discretion by enjoining the prosecution of the contract claim in Canada in view of relevant factors, including "the convenience to the parties and witnesses, the interests of the court in promoting the efficient administration of justice and the potential prejudice to one party or another." *Id.* at 856.

The court in *Seattle Totems* cited as authority the Fifth Circuit case of *In re Unterweser Reederei,* 428 F.2d 888, 896 (5th Cir.1970), wherein the Fifth Circuit affirmed the lower court's decision enjoining one of the parties from prosecuting in English courts a claim which had been pled as a counterclaim in the pending district court action. The Fifth Circuit stated that, "allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in 'inequitable hardship' and 'tend to frustrate and delay the speedy and efficient determination of the cause.'" *Id.* at 896 (footnote omitted).

Thus, the Fifth and Ninth Circuits hold that a duplication of the parties and issues, alone, is sufficient to justify a foreign antisuit injunction.

### 2.

### *Second and D.C. Circuits' View*

In *Laker Airways,* American and other non-British defendants were enjoined from seeking relief in English courts as an attempt to escape United States antitrust laws for their conduct in the United States. 731 F.2d at 956. The D.C. Circuit upheld the trial court's injunction, finding that the antitrust laws were clearly applicable to the conduct which was the subject of the claims. The court held that "a preliminary

injunction [was] imperative to preserve the court's jurisdiction." *Id.*

Similarly, the Second Circuit adopted the *Laker Airways* analysis in deciding to reverse the lower court's decision to issue an injunction. *China Trade*, 837 F.2d at 35. The Second Circuit held that a foreign antisuit injunction was not justified because the Korean litigation did not threaten the district court's jurisdiction or threaten any important public policies. *Id.* at 37.

Thus, the Second and D.C. Circuits hold that the only proper grounds to grant a foreign antisuit injunction are: 1) to protect the forum's jurisdiction, or 2) to prevent evasion of the forum's important public policies. These circuits hold that a duplication of the parties and issues, alone, is not sufficient to justify a foreign antisuit injunction. *China Trade*, 837 F.2d at 36; *Laker Airways*, 731 F.2d at 928.

The district court in this case, in concluding that the dictates of international comity did not preclude the issuance of an injunction here, did not adopt the approaches of either the Fifth and Ninth Circuits or the Second and D.C. Circuits. Instead, the court used elements from each and found that because parallel proceedings duplicate the parties and issues, the federal courts' important public policy of a just, speedy and inexpensive determination of every action under Fed.R.Civ.P. 1 and 13 would be evaded should Bankers Trust be permitted to sue Gau Shan in Hong Kong. Gau Shan agrees and argues that these and other factors favor litigation of Bankers Trust's collection claim in Tennessee.

Bankers Trust responds that this court should adopt the analysis of the Second and D.C. Circuits that a foreign antisuit injunction should issue only when the foreign proceeding 1) threatens the jurisdiction of the United States court, or 2) evades strong public policies of the United States. Bankers Trust contends there is no threat to this court's jurisdiction because the Hong Kong suit would not affect this suit. It also contends that a suit in Hong Kong would not evade any important public policies of the United States. We agree.

## III.

■ Comity dictates that foreign antisuit injunctions be issued sparingly and only in the rarest of cases. *Laker Airways*, 731 F.2d at 927. The days of American hegemony over international economic affairs have long since passed. The United States cannot today impose its economic will on the rest of the world and expect meek compliance, if indeed it ever could. The modern era is one of world economic interdependence, and economic interdependence requires cooperation and comity between nations. In an increasingly international market, commercial transactions involving players from multiple nations have become commonplace. Every one of these transactions presents the possibility of concurrent jurisdiction in the courts of the nations of the parties involved concerning any dispute arising in the transaction. This case is an example. Here, we have the possibility of concurrent jurisdiction in Hong Kong and the United States. Gau Shan asks this court to disregard the principles of international comity and affirm the issuance of an antisuit injunction which effectively denies the Hong Kong court jurisdiction over a matter otherwise properly before it, and reserves to a United States court exclusive jurisdiction over a dispute involving parties from different nations. Before taking such a drastic step, this court must consider carefully the implications of such action under principles of international comity.

Although an antisuit injunction does not directly interfere in a foreign court's jurisdiction, it "effectively restrict[s] the foreign court's ability to exercise its jurisdiction." *Laker Airways*, 731 F.2d at 927. In this case, for example, the injunction restricts the Hong Kong court's ability to exercise its jurisdiction by enjoining Bankers Trust from bringing suit in Hong Kong. In a case in which parties to an international transaction file separate suits in different forums, the availability of antisuit injunctions presents the possibility that no relief will be granted. If both the foreign court and the United States court issue injunctions preventing their respective nationals from prosecuting a suit in the

foreign forum, both actions will be paralyzed and neither party will be able to obtain any relief. The more readily courts resort to this extraordinary device, the more frequently this sort of undesirable stalemate will occur.

The inappropriate use of antisuit injunctions can have unintended, widespread effects. International commerce depends in no small part on the ability of merchants to predict the likely consequences of their conduct in overseas markets. Predictability depends in turn on an atmosphere of cooperation and reciprocity between nations. The issuance of antisuit injunctions threatens predictability by making cooperation and reciprocity between courts of different nations less likely.

In this regard, antisuit injunctions are even more destructive of international comity than, for example, refusals to enforce foreign judgments. At least in the latter context foreign courts are given the opportunity to exercise their jurisdiction. Antisuit injunctions, on the other hand, deny foreign courts the right to exercise their proper jurisdiction. Such action conveys the message, intended or not, that the issuing court has so little confidence in the foreign court's ability to adjudicate a given dispute fairly and efficiently that it is unwilling even to allow the possibility. Foreign courts can be expected to reciprocate such disrespect. Reciprocity and cooperation can only suffer as a result. Accordingly, foreign antisuit injunctions should be issued only in the most extreme cases.

■ The district court concluded that these concerns of international comity are outweighed in this case by the threat that concurrent litigation in Hong Kong would pose to the policy of the federal courts "to secure the just, speedy, and inexpensive determination of every action." Fed. R.Civ.P. 1. According to the district court, the issuance of an antisuit injunction in this case was justified in order to prevent "vexatious" litigation in Hong Kong that would delay and complicate the litigation already pending in its court. We cannot agree. We conclude that the district court's reasoning, in deciding that this case did not

violate the dictates of international comity, is more properly the analysis to be used when considering a motion for dismissal of a case on *forum non conveniens* grounds rather than a motion for a foreign antisuit injunction. The policies of avoiding hardships to the parties and promoting the economies of consolidated litigation "do not outweigh the important principles of comity that compel deference and mutual respect for concurrent foreign proceedings. Thus, the better rule is that duplication of parties and issues alone is not sufficient to justify issuance of an antisuit injunction." *Laker Airways*, 731 F.2d at 928 (footnotes omitted). *See also China Trade*, 837 F.2d at 36.

■ Factors such as "vexatiousness" or "oppressiveness" and a "race to judgment" are "likely to be present whenever parallel actions are proceeding concurrently." *China Trade*, 837 F.2d at 36. An antisuit injunction based upon these factors would tend to debilitate the policy that permits parallel actions to continue and that disfavors antisuit injunctions. *Id.* We think the reasoning of the Second and D.C. Circuits, identifying the proper criteria for issuance of antisuit injunctions, more satisfactorily accommodates the important principles of international comity a federal court should take into account. Therefore, we shall consider only two factors in determining whether Bankers Trust should be enjoined from proceeding in its Hong Kong action: 1) whether this court's jurisdiction is threatened by the Hong Kong action, and 2) whether this court's important public policies are being evaded by the Hong Kong action.

### IV.

#### A.

##### *Protecting Jurisdiction*

"Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants." *Laker Airways*, 731 F.2d at 927. Therefore, "when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court

**1356**

may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceedings." *Id.*

■ Such threats to a court's jurisdiction, however, are quite unusual. Our review of the case law reveals only two scenarios that have been held to threaten a court's jurisdiction. First, it has long been recognized that concurrent proceedings pose an inherent threat to a court's jurisdiction where the basis for that jurisdiction is *in rem* or *quasi in rem*. *See China Trade*, 837 F.2d at 36. Where jurisdiction is based on the presence of property within the court's jurisdictional boundaries, a concurrent proceeding in a foreign jurisdiction poses the danger that the foreign court will order the transfer of the property out of the jurisdictional boundaries of the first court, thus depriving it of jurisdiction over the matter. This concern, of course, is not present in this *in personam* proceeding.

■ Second, "[e]ven in *in personam* proceedings, if a foreign court is not merely proceeding in parallel but is attempting to carve out exclusive jurisdiction over the action, an injunction may also be necessary to protect the enjoining court's jurisdiction." *China Trade*, 837 F.2d at 36. This is the type of threat to jurisdiction that prompted the court in *Laker Airways* to issue an antisuit injunction. *Laker Airways*, 731 F.2d at 915. The *Laker Airways* court concluded:

> Ordinarily antisuit injunctions are not properly invoked to preempt parallel proceedings on the same in personam claim in foreign tribunals. However, KLM and Sabena do not qualify under this general rule because the foreign action they seek to join is interdictory and not parallel. It was instituted by the foreign defendants for the sole purpose of terminating the United States claim.

*Id.* Indeed, in *Laker Airways*, the British Court of Appeals actually enjoined Laker from pursuing its claims against British defendants in a United States court under United States law. *Id.* Such a direct interference with the jurisdiction of the United States court justified the defensive issuance of an antisuit injunction against the remaining defendants in the *Laker* case. *Id.*

■ Although there are many factors which favor this case being heard in the United States, and in particular Tennessee, we find nothing to indicate that the federal court's jurisdiction is threatened. Gau Shan offers no reason why this court should conclude that the Hong Kong courts would enter an antisuit injunction in this case. Moreover, Bankers Trust has stipulated that it would not seek such relief in the Hong Kong courts. Gau Shan argues that the district court's jurisdiction is threatened because, under Hong Kong law, Bankers Trust would be allowed to appoint a receiver of its choice for Gau Shan without court approval pursuant to a "Deed of Charge." The bank-appointed receiver would have the power to discharge Gau Shan's employees and to abandon any proceedings concerning Gau Shan's assets. Gau Shan contends that such an appointment could result in a dismissal of this lawsuit without ever reaching the merits of the controversy.

Although we agree with the trial court that this Deed of Charge, which is unknown in this country, is contrary to the laws of the United States, we do not find that our jurisdiction is threatened.[1] The possibility that a holding of a Hong Kong court might permit Bankers Trust to gain control of Gau Shan is not a threat to the jurisdiction of the United States courts; rather, it is merely a threat to Gau Shan's interest in prosecuting its lawsuit. In *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1212–13 (D.C.Cir.1989), the court noted this distinction and concluded that its jurisdiction was not threatened by the possibility that a ruling of a foreign court might eventually result in the voluntary dismissal of the claim before the United States court. We agree. Moreover, Bank-

1. The Deed of Charge is directly analogous to an authorization to confess judgment that is given before the transaction in question even exists. Such broad and open-ended confessions of judgment are contrary to the express statutory provisions of N.Y.Civ.Prac.L. & R. 3218.

ers Trust has represented to the district court and to this court that it will not exercise any of its receivership rights under Hong Kong law should it be permitted to proceed with its suit in Hong Kong. Therefore, we find that this court's jurisdiction is not threatened.

### B.

### Important Public Policies

■ An antisuit injunction may be appropriate when a party seeks to evade the forum's important policies by litigating before a foreign court. "While an injunction may be appropriate when a party attempts to evade compliance with a statute of the forum that effectuates important public policies, an injunction is not appropriate merely to prevent a party from seeking 'slight advantages in the substantive or procedural law to be applied in a foreign court.'" *China Trade*, 837 F.2d at 37 (quoting *Laker Airways*, 731 F.2d at 931 n. 73).

■ Gau Shan argues that the United States has a significant public policy, as stated in Fed.R.Civ.P. 1, of providing "the just, speedy, and inexpensive determination of every action." Moreover, Gau Shan argues, citing *Seattle Totems*, that under Fed.R.Civ.P. 13(a) Bankers Trust should be barred from instituting its Hong Kong action because it is required under the compulsory counterclaim rule to bring, in this litigation, the claim it wishes to prosecute in the Hong Kong suit. Gau Shan states that the purpose of requiring a defendant's claim to be brought as a counterclaim in a pending action is "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." *Seattle Totems*, 652 F.2d at 854 (quoting *Southern Construction Co. v. Pickard*, 371 U.S. 57, 60, 83 S.Ct. 108, 110, 9 L.Ed.2d 31 (1962)).

However, as noted earlier, this is an argument for dismissing a case on *forum non conveniens* grounds rather than one for enjoining a party from bringing a suit in a foreign forum. Principles of international comity require that foreign antisuit injunctions should be issued only in the most compelling circumstances and that absent such circumstances parallel proceedings should be permitted. If we were to hold that duplication of parties and issues is a sufficient basis for the issuance of a foreign antisuit injunction, parallel proceedings would never be permitted because by definition such proceedings involve the same claim and therefore the same parties and issues.

■ Gau Shan also argues that the district court did not abuse its discretion in granting the antisuit injunction because Bankers Trust's purpose in filing a Hong Kong action would be to avoid the regulatory effect of Tennessee's statute which provides treble damages for procurement of breach of contract. *See* Tenn.Code Ann. § 47–50–109. Gau Shan notes that Tennessee law will control its tort claims and asserts that this remedy is designed to effectuate important public policies of the state. Hong Kong law does not provide a comparable remedy. Gau Shan suggests that the public policy behind Tennessee's remedy might be evaded if the Hong Kong action reaches judgment first and is asserted as res judicata in the Tennessee action. Gau Shan concludes that the antisuit injunction was therefore justified because it prevented the possible evasion of these important policies.

■ We recognize that Tennessee's procurement of breach statute serves the public policy of the state. However, so does every other statute on the Tennessee books. If any advantage in law was sufficient to justify application of the public policy exception, antisuit injunctions would become common and international comity a consideration of secondary importance. Procedural or substantive advantages offered by the forum law do not, of themselves, provide grounds for an antisuit injunction.

Although there is very little case law on the magnitude of the importance of public policy considerations to the decision whether to permit an antisuit injunction, some guidance is offered by cases that analyze public policy concerns as a factor in the

decision whether to enforce a foreign judgment. In that context, courts rarely resort to public policy as a basis for refusing to enforce a foreign judgment. *See Tahan v. Hodgson*, 662 F.2d 862, 866–67 (D.C.Cir. 1981). Indeed, the D.C. Circuit enforced a foreign judgment where it found that the judgment was not "so 'repugnant to fundamental notions of what is decent and just' that American public policy requires nonenforcement" of the judgment. *Id.* at 866. To the extent there is a parallel, we think the unavailability of a treble damages remedy in Hong Kong is not so "repugnant to fundamental notions of what is decent and just" as to permit the issuance of an antisuit injunction.

We also note that Gau Shan points only to the public policy of the State of Tennessee. It does not point to any national public policy. When weighed against the concerns of international comity, the public policies of a state deserve less weight than the public policies of the nation. Indeed, although evasion of an important national policy might outweigh certain principles of international comity, we question whether the public policy of one state could ever outweigh those principles. In any case, we find that the public policy asserted by Gau Shan does not outweigh those principles here.

We therefore hold that only the evasion of the most compelling public policies of the forum will support the issuance of an antisuit injunction and conclude that the public policy that informs Tennessee's treble damages remedy for procurement of breach of contract does not rise to that level.

The apparent reason an American litigant chooses to file suit in a foreign jurisdiction is, of course, relevant to the question whether important public policies are offended. Bankers Trust stated that its reason for suing in Hong Kong was because Gau Shan is a Hong Kong corporation and its assets are located there. We find nothing in the record to the contrary. Certainly the federal court may not penalize Bankers Trust for making a strategic decision to sue in Hong Kong. We are not persuaded that Bankers Trust is attempting to evade any important public policy of this forum.

Gau Shan also argues that the cases demonstrate that whenever both the controlling law and the citizenship of the party being enjoined are within the United States, foreign antisuit injunctions have always been sustained. While that may be how the few decided cases sort out, no court has based its decision on this fact and, as nearly as we can tell, its presence in these cases is merely coincidental. Indeed, the *Laker Airways* court considered and rejected this very argument in the context of the defendants' contention in that case that the court should defer to the British injunction on the ground that the British court was enjoining its own national. *Laker Airways*, 731 F.2d at 935–36. Noting that "[t]erritoriality, not nationality, is the customary and preferred base of jurisdiction," the court concluded that whatever interests sovereign nations have in controlling the actions of their nationals, they have equal if not greater interests in seeing that their public policies are vindicated in their courts. *Id.* at 935. Moreover, the court noted, rules based on nationality tend to promote nationalism and discrimination at the expense of international comity. *Id.* at 936. We agree with the reasoning of the *Laker Airways* court and therefore reject Gau Shan's argument in this respect.

Thus, we find that the lower court erred in finding that international comity did not bar the issuance of a preliminary injunction. This court's jurisdiction is not threatened nor are important public policies being evaded. We hold therefore that international comity precludes the issuance of an antisuit injunction in this case.

## V.

For all of the foregoing reasons, we conclude that the district court abused its discretion in issuing a preliminary injunction enjoining Bankers Trust from proceeding in the Hong Kong courts. The cause is REMANDED to the district court which is directed to enter an order dissolving the

temporary injunction and to conduct such further proceedings as are consistent herewith.

NATHANIEL R. JONES, concurring.

I join in the analysis and judgment of the majority's thoughtful opinion in this case. As Judge Ryan correctly observes, the test articulated in *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C.Cir.1984), strikes the proper balance between considerations of international comity on the one hand and preserving the integrity of United States laws and the jurisdiction of its courts on the other. I embrace in particular the majority's recognition, in Part III of its opinion, that any hint of national arrogance is particularly offensive in today's climate of economic, as well as social, political and cultural, interdependence.

I write separately simply to note that, even under the more exacting *Laker Airways* standard of review, the facts of this case raise a troubling question as to whether proceedings in the Hong Kong courts do not threaten the legitimate exercise of the district court's jurisdiction. The district court based its decision to grant the injunction substantially on the fact that, under Hong Kong law, Bankers Trust might be legally entitled to appoint a receiver of its choice to dispose of its claims against Gau Shan without court approval and *prior to a resolution of the parties' claims on the merits*. Among the receiver's powers would be the right to abandon any claims, including the instant action, concerning Gau Shan's assets. Thus, appointment of a receiver under Hong Kong law could result in the dismissal of this lawsuit and depletion of Gau Shan's assets before *any* court of competent jurisdiction reached the merits of Gau Shan's claims. Such a result, in my view, would give Bankers Trust an inordinate degree of influence over the present dispute. *See id.* at 930. Also, as the majority notes, the power to appoint a receiver *prior* to judgment on the merits is contrary to the laws of the United States.

The majority distinguishes the situation here from the one before the court in *Laker Airways* by noting that the possibility that Bankers Trust might appoint a receiver "is not a threat to the jurisdiction of the United States courts; rather, it is merely a threat to Gau Shan's interest in prosecuting its lawsuit." *Supra* at 1356. While I am sympathetic to the majority's analysis, I would note that it rests at least in part on a legal fiction. We would certainly uphold the antisuit injunction if the Hong Kong courts threatened to enjoin Gau Shan from proceeding with the present action before a United States court could reach the merits of the parties' claims. Bankers Trust, however, may achieve substantially the same result under Hong Kong law simply by instructing its appointed receiver to "voluntarily" dismiss the present action. Presumably the present management of Gau Shan has no desire to see its case dismissed, voluntarily or otherwise. Moreover, no such danger would arise under the laws of the United States. Thus, I find it troubling that Gau Shan, in its present form, may effectively be deprived of its day in court, *any* court, given the extraordinary powers afforded Bankers Trust under Hong Kong law.[1]

Still, our role is not to pass upon the wisdom or justice of foreign laws, but to ensure the proper interpretation of our own. I also note, with the majority, that Bankers Trust has assured the district court and this court that it would not exercise any of its receivership rights under Hong Kong law should it be permitted to proceed with its suit in Hong Kong. Ac-

---

**1.** Although the majority relies on *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205 (D.C.Cir.1989), for support, the facts of that case are distinguishable. As the court noted, the plaintiff in *Sea Containers* would have faced the danger of losing control of its company and having its case subsequently dismissed by new management only *after* the foreign tribunal had con-

sidered the merits of the opposing parties' claim upon the parties' motion for a preliminary injunction in that court. *Id.* at 1212. Here, by contrast, it appears that Gau Shan would only be entitled to a review of the appointment of a receiver upon a showing that its debt to Banker's Trust was fraudulently obtained.

cordingly, I join in the majority's analysis
and opinion.