*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0055p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

ANSWERS IN GENESIS OF KENTUCKY, INC.,
     *Plaintiff-Appellee/Cross-Appellant,*

     *v.*

CREATION MINISTRIES INTERNATIONAL, LTD.,
     *Defendant-Appellant/Cross-Appellee.*

Nos. 08-6014/6032

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 08-00053—William O. Bertelsman, District Judge.

Argued: January 21, 2009

Decided and Filed: February 13, 2009

Before: COLE and GIBBONS, Circuit Judges; BELL, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Richard Alan Getty, GETTY & CHILDERS, Lexington, Kentucky, for Appellant. Anthony J. Biller, COATS & BENNETT, Cary, North Carolina, for Appellee. **ON BRIEF:** Richard Alan Getty, GETTY & CHILDERS, Lexington, Kentucky, for Appellant. Anthony J. Biller, COATS & BENNETT, Cary, North Carolina, for Appellee.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. This appeal presents multiple issues of first impression for our circuit. Defendant-appellant Creation Ministries International, Ltd., ("CMI") appeals the district court's order compelling arbitration of its disputes with

_____

[*]The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

1

fellow ministry Answers in Genesis of Kentucky, Inc. ("AiG").  Specifically, CMI asserts that the district court erred in declining to dismiss AiG's suit on the basis of the contracts' forum selection clause, declining to abstain in favor of CMI's prior-filed Australian litigation, and compelling arbitration on all of AiG's claims.  AiG cross-appeals the district court's order declining to issue a foreign antisuit injunction to block CMI from further pursuing its Australian litigation.  We hold that the district court properly compelled the parties to arbitration and did not abuse its discretion in declining to issue an antisuit injunction based upon the facts as they now stand.  We therefore affirm the judgment of the district court in its entirety.

**I.**

This case arises from a motion to compel arbitration filed under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 206, by AiG, a Kentucky non-profit corporation headquartered in Petersburg, Kentucky, against CMI, an Australian non-profit corporation organized under the laws of the State of Queensland, Australia.  In 1980, a group of Australian religious adherents joined together to form the Creation Science Foundation ("Foundation"), CMI's predecessor organization.  According to one of the original members, the Foundation's purpose "was to promote creationism and apologetics" throughout Australia.  Among the founders was Ken Ham, an Australian minister and "creation science" advocate.  Since the 1970s, another Australian creation science supporter, Carl Wieland, began publishing a magazine known as *Ex Nihilo* to publicize advances in creation science.  The magazine would later become known as *Creation Magazine*.  Wieland transferred production responsibility to the Foundation for his magazine sometime "in the late 1970's or early 1980's."  Wieland joined the Foundation and, along with Ham, became one of the Foundation's two main leaders.

In 1987, Ham moved from his native Australia to the United States.  Seven years later, Ham founded an American counterpart to the Foundation headquartered in Kentucky, which would become known as AiG.  The two organizations were separate entities but worked closely together until the events that gave rise to the current litigation

occurred. As AiG grew in membership and financial resources, it began to eclipse its Australian counterpart, which had by now come to be led largely by Wieland. AiG established and funded a website, [www.answersingenesis.org](www.answersingenesis.org), that both AiG and the Foundation used to spread the discoveries of creation science. AiG also purchased significant numbers of each issue of *Creation Magazine* for distribution to American subscribers. AiG's growth caused significant tension to develop between Ham and Wieland, as each vied for control of what was becoming an increasingly international movement to teach creationism.

The Foundation[1] had joined with AiG in founding Answers in Genesis International ("AiGI") to foster relationships among creation science organizations in other Commonwealth countries, such as Canada, South Africa, New Zealand, and the United Kingdom. Ownership of AiGI was split between the Foundation and AiG. AiG held a fifty percent share in AiGI. Around March 2005, Wieland proposed a new model for control of AiGI. Wieland referred to this new proposal as a much needed "democratic reform" in the structure of the international ministry. The "reform" would give each branch of the international ministry one vote at AiGI board meetings. From AiG's perspective, the sole purpose of this reform was to dilute the American organization's influence over the creation science movement and concomitantly place Wieland in sole control of AiGI. AiG believed that the small organizations in countries such as South Africa and New Zealand were under Wieland's control to the extent that their votes would merely parrot his. Unsurprisingly, AiG rejected Wieland's democratic reform, and relations between the American and Australian ministries deteriorated rapidly.

Some of the Foundation's board members sought to heal the developing schism. They tried to accomplish this by moving toward a more business-like relationship with AiG. On October 11-13, 2005, the boards of directors of both AiG and the Foundation

---

[1]By this time, the Foundation had changed its name to Answers in Genesis-Australia. For clarity, this opinion will continue to refer to the Australian entity as the Foundation until the time when the Foundation's name changed to its current appellation, Creation Ministries International.

met in Petersburg, Kentucky, in an attempt to settle their differences over the control structure of AiGI as well as the disputes that arose over *Creation Magazine*'s content and distribution and the content found on the two ministries' joint website. The meetings produced a series of signed agreements that form the basis of the current litigation on two continents.

On October 13, 2005, the members of both organizations' boards of directors executed a Memorandum of Agreement ("MOA"). The MOA provided for several transfers of property and contractual rights in an attempt to divide each organization's responsibilities within the larger creation science movement. Among other provisions, the MOA required the Foundation to transfer to AiG ownership of certain international copyrights and the competing domain name www.answersingenesis.com. MOA at 1. The Foundation would also begin to pay a fee to AiG for AiG's maintaining their joint website www.answersingenesis.org. MOA at 2. In return, AiG would transfer to the Foundation AiG's fifty percent voting share in AiGI, giving the Foundation complete control over the international organization. MOA at 1. AiG also agreed to pay a fee to the Foundation for each future article the Foundation provided for the joint website. The Foundation concomitantly agreed to grant an express license to AiG for the use of all articles that had previously appeared on either the website or in AiG's publications. MOA at 2. Most importantly, the MOA closed with an arbitration clause that provided "in the event of a disagreement" the parties would "submit the matter to Christian arbitration." MOA at 2-3.

That same day, the parties also executed a Deed of Copyright License ("DOCL"). The DOCL granted AiG a license to continue to use the articles the Foundation had provided for its website and publications. DOCL at 5-6. Thus, the DOCL fulfilled the Foundation's obligations under the MOA to validate AiG's use of the Foundation's intellectual property. The DOCL closed by noting that "the law applicable to the State of Victoria, Australia" applied and "[t]he parties submit to the non-exclusive jurisdiction of its courts and courts of appeal." DOCL at 7-8.

Although the two boards had ratified the agreements, Wieland fiercely objected to their content. Deepening internal tension led the membership of the Foundation's board to resign. Wieland replaced the board's membership with appointees of his own liking. This new board joined Wieland in seeking to reject the MOA and DOCL. The board also voted to change the name of the Foundation to its current name of Creation Ministries International ("CMI") effective January 19, 2006. The CMI board sought to explain its actions by commissioning an internal inquiry to examine the circumstances that led to the schism between CMI and AiG. This inquiry, known as the "Briese Report," released its findings on February 16, 2007. The Briese Report concluded that the position of Wieland and his new board was correct and that the new board had properly sought to renounce the prior board's actions. The Briese Report also sought to cast blame for the schism onto AiG.

AiG rebuffed CMI's efforts to invalidate the agreements. With both sides having reached an impasse over the status of the MOA and DOCL, legal action commenced. CMI struck first; and on May 31, 2007, it filed suit in the Supreme Court of Queensland[2] against both AiG and AiG's leader Ken Ham. CMI's "Statement of Claim" sought declaratory, injunctive, and monetary relief as to both defendants. The complaint did not seek to compel arbitration.

The parties attempted one last time to reach an out-of-court settlement by meeting with a mediator in Hawaii on August 14-15, 2007. Ultimately, the parties were unable to agree upon any settlement. On January 29, 2008, the parties halted all efforts to reach an amicable agreement, and CMI instructed AiG to proceed with its defense in the Australian action.

Instead, on March 24, 2008, AiG moved to compel arbitration in the Eastern District of Kentucky under the FAA. AiG additionally sought to enjoin CMI from pursuing its Australian suit. Both parties informed the district court that the parties had agreed voluntarily to adjourn the Australian proceedings pending final resolution of the

---

[2]The Supreme Court is the State of Queensland's trial court.

American litigation.  The district court conducted a hearing and on August 8, 2008, issued its order and opinion.  In its opinion, the district court read the multiple agreements *in para materia* because they were all executed on the same day as part of an effort to achieve a settlement of all outstanding issues.  *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, No. 2:08-cv-00053-WOB, slip op. at 2 (E.D. Ky. Aug. 8, 2008).  The district court further found that the arbitration clause was broadly written and covered all of the issues for which AiG sought resolution.  *Id.*  Consequently, the district court entered an order compelling arbitration as to all the disputes between the parties.  *Id.* at 3-4.  Because the contract did not select a site at which to hold the arbitration, the district court ordered the arbitration to occur within the Eastern District of Kentucky.  *Id.  See also* 9 U.S.C. § 4 and § 208.  Finally, the district court declined to issue a foreign antisuit injunction to halt the Australian litigation.  *Answers in Genesis*, slip op. at 3.  CMI timely appealed the district court's final judgment.  AiG timely filed its notice of cross-appeal as to the district court's refusal to issue an antisuit injunction.

On August 15, 2008, AiG instituted an arbitration proceeding against CMI with the International Centre for Dispute Resolution.  The district court denied CMI's motion to stay the arbitration pending appeal after CMI refused to agree to a joint stay order that would prevent CMI from reactivating its Australian litigation.  CMI has filed a motion with this court to stay the arbitration proceedings.  In light of our disposition of this appeal, we will deny the motion to stay as moot.

**II.**

**A.**

We first note the issue of our jurisdiction.  While neither of the parties has questioned this court's jurisdiction to hear this appeal, federal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte.  See Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir. 1990); *see also Capron v. Van Noorden*, 6 U.S. (2 Cranch) 126, 127 (1804) ("[I]t [is] the duty of the Court to see that they had jurisdiction, for the consent of the parties could not

give it."). The FAA generally prohibits interlocutory appeals of orders compelling arbitration. *See* 9 U.S.C. § 16(b)(3). However, because AiG petitioned the district court to enjoin the Australian proceedings pending arbitration, we do have jurisdiction under 9 U.S.C. § 16(a)(1) and 28 U.S.C. § 1292 (a)(1) to hear this appeal. *See Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006).

## B.

Having concluded that we have jurisdiction to consider this appeal, we now consider the arguments raised by both parties. CMI contends that the explicit language of the forum selection clause requires that the only proper forum for any suit between CMI and AiG concerning these agreements is in Australia. Importantly, CMI does not challenge on appeal either the ruling of the district court that the multiple contracts at issue are to be read *in para materia* or that the MOA and DOCL are valid, enforceable contracts. AiG responds that the arbitration and forum selection clauses are mutually exclusive such that the forum selection clause only applies if neither party seeks to arbitrate the dispute. Therefore, AiG asserts that because it seeks to compel arbitration, the forum selection clause is inapplicable. Both parties' arguments are misguided, and the plain language of the contractual provisions at issue provides that Australia is only one possible forum for any potential litigation.

The proper construction of a contract is an issue of law; therefore, this court reviews questions of contract interpretation under a *de novo* standard. *Noe v. PolyOne Corp.*, 520 F.3d 548, 551 (6th Cir. 2008). The language of the forum selection clause appears in Section 6.2 of the DOCL. It reads:

> This Deed is governed by the law applicable to the *State of Victoria, Australia*. The parties submit to the *non-exclusive jurisdiction of its courts and courts of appeal* from them. The parties will not object to the exercise of jurisdiction by those courts on any basis.

DOCL at 7-8 (emphasis added). The district court held that one must read the DOCL and MOA *in para materia* because the parties executed both agreements on the same day. As neither party has appealed this ruling of the district court, we will read the

forum selection clause contained in the DOCL together with the arbitration language in the MOA.  Paragraph eight of the MOA provides:

> The parties will enter to [sic] such other agreements as are necessary to accomplish the purposes and provisions of this Memorandum of Agreement.  In the event of a disagreement of the parties regarding the meaning or application of any provision of this Agreement or any related agreements, the parties agree to submit such matter to Christian mediation to a Christian mediator agreed upon by them.  In the event such matter is not resolved by mediation, then the parties will submit the matter to Christian arbitration to a Christian arbitrator agreed upon by them, and the decision of the arbitrator shall be final.

MOA at 2-3.  Notably, the arbitration agreement is silent as to where the arbitration should take place.

The plain language of the agreements quoted above forecloses CMI's argument that the only proper forum is in Australia and makes AiG's complicated argument unnecessary.  The forum selection clause expressly provides that the "courts and courts of appeal" of the "State of Victoria, Australia" are the "non-exclusive jurisdiction" in which the parties may file suit.  CMI's argument that this contractual provision required the district court to dismiss AiG's motion to compel arbitration would read the word "non-exclusive" out of the contract.  AiG's argument would have us read into the contract an entire clause that does not appear; namely, that the forum selection clause only applies if no one seeks arbitration.  As we have noted, "If a contract is clear and unambiguous . . . there is no issue of fact to be determined." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008) (alteration in original) (quoting *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 684 (6th Cir. 2000)).  Reading the provision's language "as a whole" and giving it "its ordinary and natural meaning," the contract language clearly and unambiguously provides that the courts of the State of Victoria are only one possible forum.  *Id.*

(citation omitted).  The district court did not err in refusing to dismiss AiG's motion to compel arbitration based upon the contract's forum selection clause.[3]

## C.

CMI next contends that if the district court properly construed the forum selection clause, the district court nonetheless should have abstained on the basis of international comity.  CMI suggests that this court combine the Eleventh Circuit's analysis in *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512 (11th Cir. 1994), with the factors enumerated by the Supreme Court in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), to come to the conclusion that comity and fairness dictate staying the American litigation.  AiG responds that abstention is inappropriate in this case – both because the factors suggested by CMI weigh against abstention and the strong public policy of the United States supporting arbitration makes abstention inappropriate.

We review a district court's decision on issues of abstention *de novo* because of the complex interaction of federal jurisdictional and comity concerns.  *See Chellman-Shelton v. Glenn*, 197 F. App'x 392, 393 (6th Cir. 2006) (citing *Superior Beverage Co., Inc. v. Schieffelin & Co., Inc.*, 448 F.3d 910, 913 (6th Cir. 2006)).  *Cf. Traughber v. Beauchane*, 760 F.2d 673, 676 (6th Cir. 1985).  "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River*, 424 U.S. at 813.  Abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* (internal quotes and citation omitted).  Despite this truism, "in some private international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction." *Turner*, 25 F.3d at 1518.

---

[3]We further note that CMI's own actions ratify our interpretation. If CMI's reading of the clause is correct, the only possible forum for any suit concerning these agreements is "the State of *Victoria*, Australia." DOCL at 7 (emphasis added).  CMI filed its suit in the State of *Queensland*, Australia. Thus, CMI's proposed interpretation would mean that CMI itself has failed to file in the proper forum.

Whether to abstain in regard to a motion to compel arbitration because of international comity concerns is an issue of first impression in this circuit. Case law is available from other circuits in the area of abstention based upon international comity in general. "One approach has taken the criteria enunciated in *Colorado River* and applied them to the international context" while another approach has developed a similar test with more of a focus on the "special concerns" injected by international comity. *Id.* (collecting cases). CMI suggests adopting the approach of the Eleventh Circuit in *Turner*, which combined the two complementary lines of cases to develop a multi-factor balancing test weighing international comity, concerns about "fairness to litigants," and the "efficient use of scarce judicial resources." *Id.*

By contrast, *Colorado River* instructed courts to consider several factors in determining whether to abstain in favor of a parallel proceeding in the courts of another sovereign. The "most important" factor courts are to consider is whether there exists a "clear federal policy evinc[ing] . . . the avoidance of piecemeal adjudication." 424 U.S. at 819. Additional factors include how far the parallel proceeding has advanced in the other sovereign's courts, the number of defendants and complexity of the proceeding, the convenience of the parties, and whether a sovereign government is participating in the suit. *Id.* at 820. For the purposes of this appeal, it is not necessary that we decide whether abstention is ever appropriate when one party seeks to compel arbitration with regard to an agreement in which the other party is international in origin. We conclude that even assuming that abstention might be appropriate in such a circumstance, CMI has not met its burden in proving that abstention is required. We base our conclusion upon weighing the factors found in the *Colorado River* test. We believe the factors found in *Colorado River* are the most applicable to the case at bar because those factors and their relative weight match most closely the public-policy concerns the Supreme Court has identified as vital in the area of arbitration.

*Colorado River* instructs that the "most important" factor a court must consider is whether there is a "clear federal policy evinc[ing] . . . the avoidance of piecemeal adjudication" found within the statutory scheme at issue. *Id.* at 819. In the case of the

Federal Arbitration Act, there most clearly is not such a policy. In *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985), the Supreme Court considered whether concerns over "bifurcated proceedings" should cause a district court to refuse to compel arbitration when one set of state-law claims was subject to arbitration and another interrelated set of federal-law claims was not. *Id.* at 216-17. Dean Witter wished to stay arbitration of the arbitrable state-law claims in favor of allowing the federal-law claims to proceed first in the district court. *Id.* at 215. Dean Witter raised many of the same concerns CMI raises here, including duplication of resources and the possible *res judicata* effect should one proceeding end prior to the other. *Id.* at 216-17, 221-22. The Supreme Court rejected Dean Witter's arguments and held that the "Arbitration Act requires district courts to compel arbitration of . . . arbitrable claims when one of the parties files a motion to compel, *even where the result would be the possibly inefficient maintenance of separate proceedings in different forums*." *Id.* at 217 (emphasis added). The Court further observed that "[t]he preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered." *Id.* at 221. This concern should govern even if "piecemeal litigation" was the inevitable result. *Id.* (internal quotes omitted). Thus, CMI cannot point to a clearly articulated policy against bifurcated litigation with regard to the FAA.

International law, as incorporated by congressional action, supports our conclusion that abstention is inappropriate in this case. A similar concern for enforcing private agreements led to the adoption of the international treaty under which AiG seeks to vindicate its right to arbitrate. AiG filed this action under § 206 of the FAA. 9 U.S.C. § 206. Section 206 provides that district courts may compel arbitration upon motion of a party to an agreement covered by the 1958 Convention on the Recognition and Enforcement of Arbitral Awards ("Convention").[4] Chapter Two of the FAA incorporates the provisions of the Convention into American domestic law. *See* 9 U.S.C. §§ 201-208. Both Australia and the United States are signatories to the

---

[4]The Convention is more popularly known as "The New York Convention," after the place of its negotiation. *See* Status: 1958 - Convention on the Recognition and Enforcement of Foreign Arbitral Awards, http://www.uncitral.org/uncitral/en/uncitral_texts/ arbitration/NYConvention_status.html.

Convention, and thus its terms govern the resolution of this dispute. *See* Status: 1958 - Convention on the Recognition and Enforcement of Foreign Arbitral Awards, http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html (listing both Australia and the United States as signatories). Article II of the Convention, as incorporated by the FAA, establishes the requirements necessary for an arbitration agreement to come within the Convention's terms. The agreement must be in writing, concern a "legal relationship . . . which is considered as commercial," and either at least one party to the contract must not be an American citizen or the commercial relationship must have a "reasonable relation with one or more foreign states." 9 U.S.C. § 202. *Cf.* Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. II, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38. [hereinafter Convention] The MOA and DOCL, which concern the transfer of multiples pieces of intellectual property and corporate stock, are in writing and clearly concern a commercial topic. Furthermore, it is undisputed that AiG is an American corporation; and CMI is Australian in citizenship. All of the Convention's requirements are therefore met. Consequently, "when one of the parties" to the arbitration agreement requests a court refer the dispute to arbitration, that court "shall" do so. Convention art. II(3). *Cf.* 9 U.S.C. § 208.

As other courts construing the Convention's language have observed, "there is nothing discretionary about Article II(3) of the Convention." *Tennessee Imports, Inc. v. Filippi*, 745 F. Supp. 1314, 1322 (M.D. Tenn. 1990) (quoting *McCreary Tire & Rubber Co. v. CEAT S.P.A.*, 501 F.2d 1032, 1037 (3d Cir. 1974)). The language of the treaty and its statutory incorporation provide for no exceptions. When any party seeks arbitration, if the agreement falls within the convention, we must compel the arbitration unless the agreement is "null and void, inoperative, or incapable of being performed." Convention art. II(3). CMI makes no such argument before us. Further, it is difficult to see how comity concerns could come into play where both Australia and the United States, as signatories to the Convention, apply the same law. CMI did not seek to compel arbitration in its action. AiG instead filed the first action seeking to compel arbitration. To assume that the district court's order infringes on comity concerns is to

assume that Australian courts would not follow their obligation under the Convention, as CMI's argument must rest upon an assumption that an Australian court would be less likely to order arbitration.  Such an argument both demeans the foreign tribunal and hardly advances the comity interests that CMI claims to seek to vindicate. *Cf. Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1355 (6th Cir. 1992) (noting that federal courts should not seek to convey a message that they have "little confidence in the foreign court's ability to adjudicate a given dispute fairly").

Finally, we note that the other factors delineated in *Colorado River* do not clearly weigh in CMI's favor.  The Australian proceeding is only in its initial stages, and the Australian courts have yet to consider AiG's jurisdictional and venue defenses.  Because one group of witnesses is in Australia and another separate group is in Kentucky, either forum will be inconvenient for half of the parties such that this factor is a draw.  The issues raised by the parties involve the interpretation of a half-century-old Convention whose terms are largely unambiguous, and no sovereign is participating in these proceedings.  *Cf. Colorado River*, 424 U.S. at 820.  Consequently, because neither international comity nor the traditional abstention factors applicable to parallel proceedings  require abstention, we hold that the district court did not err in declining to abstain in favor of the prior-filed Australian proceedings.

### D.

CMI's third issue on appeal is that the district court erred in submitting all of AiG's numerous causes of action against CMI to binding arbitration.  CMI claims that the text of the arbitration clause only requires issues concerning the ownership of the AiG trademark, the copyright licenses contained in the MOA and DOCL, and whether CMI breached its obligations under those two documents to be submitted to arbitration. AiG responds that, contrary to CMI's assertions, the arbitration clause is broadly worded, and therefore the district court properly submitted all of the parties' disputes to the arbitrator.

We "review[] *de novo* a district court's conclusions of law regarding whether to compel arbitration pursuant to the Federal Arbitration Act." *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 649 (6th Cir. 2008). To determine the breadth of the arbitration clause at issue, we must refer to the actual wording found in the MOA, which provides in pertinent part: "In the event of a disagreement of the parties regarding the meaning or application of *any provision of this Agreement or any related agreements* . . . . then the parties will submit the matter to Christian arbitration . . . and the decision of the arbitrator shall be final." MOA at 2-3 (emphasis added). Contrary to CMI's arguments, the arbitration agreement is not limited to only the MOA and DOCL. The clear language of the arbitration clause says "this Agreement or any related agreements." To limit the scope of the arbitration clause to only the MOA and DOCL would read the words "or any related agreements" out of the contract. *See Royal Ins. Co. of Am.*, 525 F.3d at 421 ("clear and unambiguous" terms should be enforced as written). Therefore, we hold that the district court did not err in its finding that the arbitration clause is not limited to only those issues whose origin one can find within the four corners of the MOA and DOCL.

We next turn to the question of whether the remaining disputed issues should be submitted to arbitration. CMI concedes that those issues concerning the intellectual property directly referenced in the DOCL and MOA are arbitrable.[5] CMI, however, continues to assert that the district court erred in compelling arbitration as to the claims that deal with the Distribution Agreement of 1994, which governed how AiG would purchase copies of *Creation Magazine* and distribute them to American subscribers, and whether CMI has defamed or tortiously interfered with AiG's contracts through CMI's statements concerning the DOCL, MOA, and related agreements. Determining whether the disputes are arbitrable requires examining the breadth of the arbitration clause.

---

[5]To the extent that CMI argues that it is inappropriate for an American court to interpret the validity of foreign intellectual property rights, we note that this case does not require any American court to do so. Our role is merely to interpret and enforce the arbitration agreement. The question of the construction and validity of the underlying trademark and copyright provisions at issue is for the arbitrator. *Cf. Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1375-76 (Fed. Cir. 1994) (finding that district courts do not have jurisdiction to determine directly the validity of a foreign patent).

*Watson Wyatt*, 513 F.3d at 649.  The clause requires "disagreement[s] . . . regarding the meaning or application of any provision . . . [of] any related agreements" to be arbitrated.  MOA at 2-3.  In *Watson Wyatt*, we considered an arbitration agreement that provided "any dispute or claim arising from or in connection with this agreement" is subject to arbitration and concluded that the arbitration clause was broad.  513 F.3d at 649 (emphasis removed).  Comparing the language in *Watson Wyatt* to that in the agreement between AiG and CMI, we conclude that the language is similarly broad as long as an issue concerning "the meaning or application of any provision . . . [of] any related agreements" is involved.  Therefore, the dispositive question is whether one may fairly characterize the remaining disputes as concerning the "meaning" or "application" of the agreements' provisions.

We have held that where a dispute involves a broadly written arbitration clause "only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by the arbitrators."  *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 577 (6th Cir. 2003) (internal quotes and citation omitted).  Furthermore, district courts are "required to give a general presumption of arbitrability and to resolve any doubts in favor of arbitration."  *Watson Wyatt*, 513 F.3d at 650.  This general rule governs "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) (internal quotes and citation omitted).  This is because, "[t]he FAA manifests a liberal federal policy favoring arbitration agreements."  *Watson Wyatt*, 513 F.3d at 649 (internal quotes and citation omitted).

Applying these considerations to the case at bar, the Distribution Agreement of 1994 concerns whether AiG was contractually required to distribute *Creation Magazine* to American subscribers.  *Creation Magazine* contained articles written by CMI members on the topic of creation science.  The DOCL expressly grants rights to AiG in all articles produced by CMI both *before* and after the execution of the DOCL and

explicitly mentions *Creation Magazine*, and all of its prior titles, by name. DOCL at 1, 3. Therefore, the DOCL may well have altered the rights and obligations of the parties pursuant to the Distribution Agreement. Because the "meaning" of the agreement is at issue in determining the rights and obligations of the parties in the "related" Distribution Agreement, the district court properly held that all claims related to the Distribution Agreement are arbitrable. *Cf. Highlands Wellmont*, 350 F.3d at 577 (only "the most forceful evidence" will result in exclusion of a claim from the scope of a broad arbitration clause).

The second subset of claims consists of AiG's contention that statements made in the Briese Report and on CMI's separate website defamed AiG and/or tortiously interfered with contracts AiG had with third parties. Truth is an absolute defense to defamation. *See Lassiter v. Lassiter*, 280 F. App'x 503, 504 (6th Cir. 2008); *see also Li v. The Herald and Weekly Times Pty. Ltd.*, 2007 VSC 109 (S. Ct. Victoria Apr. 20, 2007). If CMI is correct in its interpretation of the "meaning" of the agreements, then CMI cannot have defamed or interfered wrongfully with AiG's contracts. Once again, in order to resolve the issue, an adjudicatory body must determine what the proper "meaning" of the agreements is. Applying the "general presumption of arbitrability," *Watson Wyatt*, 513 F.3d at 650, the district court did not err in submitting these claims to arbitration.

## E.

Finally, AiG cross-appeals the district court's order declining to issue a foreign antisuit injunction. We have only considered the propriety of a district court's issuance of such an injunction once. *See Gau Shan Co.*, 956 F.2d at 1351. In *Gau Shan*, we observed that while it is "well settled that American courts have the power" to issue foreign antisuit injunctions, "[c]omity dictates that [these injunctions] be issued sparingly and only in the rarest of cases." *Id.* at 1353-54. To determine whether a foreign antisuit injunction should issue, we are to look at whether an injunction is necessary to protect the jurisdiction of a federal court or if allowing the foreign litigation

to continue would allow a party "to evade the forum's important policies." *Id.* at 1355, 1357.

It would be difficult for us to say that CMI was "attempting to evade [an] important public policy of this forum" by filing suit in an Australian court when Australia is also a signatory to the Convention. *Cf. id.* at 1358. However, we need not interpret the full import of our holding in *Gau Shan* in order to decide this case in its current procedural posture. The parties have voluntarily suspended the Australian proceedings while we consider CMI's appeal. With the benefit of our opinion, the parties will be in a much-improved position to consider their future legal options. It would be unwise for us to speculate as to what course of action CMI will take, and such speculation would likely be required for us definitively to hold what *Gau Shan* demands of injunction-seeking parties. We simply note that with the Australian proceedings suspended, we believe that the district court clearly did not abuse its discretion in declining, at this time, to issue a foreign antisuit injunction. *Id.* at 1352 (noting that the standard of review is abuse of discretion). Should the status of the Australian litigation change following the issuance of our opinion, AiG may renew its motion for an injunction before the district court. At that time, the district court may apply the *Gau Shan* factors to the then-present facts and make a new determination.

## III.

For the foregoing reasons, we affirm the judgment of the district court in its entirety. Our affirmance as to the district court's refusal to issue a foreign antisuit injunction is without prejudice so that AiG may renew its motion before the district court should proceedings in the Australian suit resume. We also deny CMI's motion to stay arbitration as moot in light of our disposition of this appeal.